## CASE ET AL. *v.* LOS ANGELES LUMBER PRODUCTS CO., LTD.

Nos. 23 and 24. Argued October 18, 1939.—Decided November 6, 1939.

*Mr. Robert M. Clarke,* with whom *Mr. Thomas K. Case, in propria persona,* was on the brief, for petitioners.

By special leave of Court, *Solicitor General Jackson,* with whom *Messrs. Warner W. Gardner, Robert K. Mc-Connaughey, Daniel W. Knowlton, Chester T. Lane, Samuel H. Levy,* and *Homer Kripke* were on the brief, for the United States, as *amicus curiae,* urging reversal.

*Messrs. J. Clifford Argue* and *John C. Macfarland,* with whom *Messrs. David R. Faries, H. D. Crotty,* and *Woodward M. Taylor* were on the brief, for respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

These cases [1] present the question of the conditions under which stockholders may participate in a plan

---

[1] One involves an interlocutory order and the other a final order confirming a plan of reorganization under § 77B of the Bankruptcy Act.

of reorganization under § 77B (48 Stat. 912) of the Bankruptcy Act where the debtor corporation is insolvent both in the equity and in the bankruptcy sense. Because of the contrariety of tendencies in practical administration of the Act among the circuits as illustrated by the differences between the holding below (100 F. 2d 963) and that in *In re Barclay Park Corp.*, 90 F. 2d 595, we granted certiorari.

The debtor is a holding company owning all of the outstanding shares of the capital stock (except for certain qualifying shares held by directors) of six subsidiaries. Three of these have no assets of value to the debtor. Two have assets of little value. The debtor's principal asset consists of the stock of Los Angeles Shipbuilding and Drydock Corporation which is engaged in shipbuilding and ship repair work in California. This subsidiary has fixed assets of $430,000 and current assets of approximately $400,000. This subsidiary has only current debts of a small amount, not affected by the plan. The debtor's assets other than the stock of its subsidiaries aggregate less than $10,000.

The debtor's liabilities[2] consist of principal and interest of $3,807,071.88 on first lien mortgage bonds issued in 1924 and maturing in 1944, secured by a trust indenture covering the fixed assets of Los Angeles Shipbuilding and Drydock Corporation (one of the subsidiaries) and the capital stock of all of the subsidiaries. No interest has been paid on these bonds since February 1, 1929. In 1930, as a consequence of the financial embarrassment of the debtor, a so-called voluntary reorganization was effected. To that end, a supplement to this trust indenture was executed, pursuant to a provision therein, with the consent of about 97% of the face value of all

---

[2] Other liabilities, not material here, are $6,075.94 of current accounts payable and $496,899.76 due the Los Angeles Shipbuilding and Drydock Corporation.

the outstanding bonds, which reduced the interest from 7½% to 6% and made the interest payable only if earned. At the same time the old stock of the debtor was wiped out by assessment and new stock issued, divided into Class A and Class B, with equal voting rights. Class A stock was issued to some of the old stockholders who contributed $400,000 new money which was turned over to the Los Angeles Shipbuilding and Drydock Corporation and used by it as working capital. In consideration of this contribution the bondholders who agreed to the modification of the indenture likewise re- leased the stockholders' liability under California law in favor of these contributors. Some Class B stock was issued to bondholders in payment of unpaid interest coupons.[3] At present there are outstanding 57,788 shares of Class A stock and 5,112 shares of Class B stock.

In 1937 the management prepared a plan of reorgan- ization to which over 80% of the bondholders and over 90% of the stock assented. This plan of reorganization, as we shall discuss hereafter, provided for its consumma- tion either on the basis of contract or in a § 77B pro- ceeding, such election to be made by the board of di- rectors. In January 1938 the directors chose the latter course and the debtor corporation filed a petition for reorganization under § 77B of the Bankruptcy Act, with the plan attached and reciting, *inter alia,* that the re- quired percentage of security holders had consented to it. This plan as filed was later modified by the debtor, as we point out later, in a manner not deemed by us ma-

---

[3] A large block of Class B stock was escrowed under a management contract with one Armes to be delivered to him when all the bonds were retired and the Class A stockholders were paid back their $400,000 plus interest in the form of dividends. But this management contract was later terminated and the escrowed Class B stock was returned to the debtor and cancelled. Class A stock was preferred to Class B in the event of liquidation to the amount of $400,000 and interest.

terial to the issues here involved. That plan as modified provides for the formation of a new corporation, which will acquire the assets of Los Angeles Shipbuilding and Drydock Corporation,[4] and which will have a capital structure of 1,000,000 shares of authorized $1 par value voting stock. This stock is divided into 811,375 shares of preferred and 188,625 shares of common. The preferred stock will be entitled to a 5% non-cumulative dividend, after which the common stock will be entitled to a similar dividend. Thereafter all shares of both classes will participate equally in dividends. The preferred stock will receive on liquidation a preference to the amount of its par value. Thereupon the common will receive a similar preference. Thereafter all shares of both classes participate equally.

170,000 shares of preferred are reserved for sale to raise money for rehabilitation of the yards.[5] 641,375 shares of the preferred are to be issued to the bondholders, 250 shares to be exchanged for each $1000 bond. The Class A stockholders will receive the 188,625 shares of common stock, without the payment of any subscription or assessment. No provision is made for the old Class B stock. The aggregate par value of the total preferred and common stock to be issued to existing security holders is $830,000—an amount which equals the going concern value of the assets of the enterprise.

The plan was assented to by approximately 92.81% of the face amount of the bonds, 99.75% of the Class A

[4] The assets of the debtor, except the capital stock of two subsidiaries which have assets of some, though slight, value will also be transferred to the new company. The assets of these two subsidiaries will be liquidated and the proceeds distributed pro rata among bondholders. The assets of the other three subsidiaries will also apparently be acquired by the new company.

[5] No underwriting of these funds is provided and no disclosure is made as to how the additional funds are to be raised.

stock, and 90% of the Class B stock. Petitioners own $18,500 face amount of the bonds. They did not consent to the so-called voluntary reorganization in 1930 whereby the trust indenture was amended. And throughout the present § 77B proceedings they appropriately objected that the plan was not fair and equitable to bondholders.

The District Court found that the debtor was insolvent both in the equity sense and in the bankruptcy sense. The latter finding was based upon "appraisal and audit reports." In this connection the court found that the total value of all assets of Los Angeles Shipbuilding and Drydock Corporation was $830,000, those assets constituting practically all of the assets of the debtor and of its various subsidiaries of any value to the estate. Yet in spite of this finding, the court, in the orders now under review, confirmed the plan. And the court approved it despite the fact that the old stockholders, who have no equity in the assets of the enterprise, are given 23% of the assets and voting power in the new company without making any fresh contribution by way of subscription or assessment. The court, however, justified inclusion of the stockholders in the plan (1) because it apparently felt that the relative priorities of the bondholders and stockholders were maintained by virtue of the preferences accorded the stock which the bondholders were to receive and the fact that the stock going to the bondholders carried 77% of the voting power of all the stock presently to be issued under the plan; and (2) because it was able to find that they had furnished the bondholders certain "compensating advantages" or "consideration." This so-called consideration was stated by the District Court in substance as follows:

1. It will be an asset of value to the new company to retain the old stockholders in the business because of "their familiarity with the operation" of the business and their "financial standing and influence in the com-

munity"; and because they can provide a "continuity of management."

2. If the bondholders were able to foreclose now and liquidate the debtor's assets, they would receive "substantially less than the present appraised value" of the assets.

3. By reason of the so-called voluntary reorganization in 1930, the bondholders cannot foreclose until 1944, the old stockholders having the right to manage and control the debtor until that time. At least the bondholders cannot now foreclose without "long and protracted litigation" which would be "expensive and of great injury" to the debtor. Hence, the virtual abrogation of the agreement deferring foreclosure until 1944 was "the principal valuable consideration" passing to the bondholders from the old stockholders.

4. Bonding companies are unwilling to assume the risk of becoming surety for the debtor or its principal subsidiary "because of the outstanding bond issue." The government's construction program will provide "valuable opportunities" to the debtor if it is prepared to handle the business. Hence, the value to the bondholders of maintaining the debtor "as a going concern, and of avoiding litigation, is in excess of the value of the stock being issued" to the old stockholders.

The Circuit Court of Appeals in affirming the decree confirming the plan stated that it was not possible for it to do other than accept these findings because of a stipulation and the state of the record thereunder. That stipulation provided for an abbreviated record and stated that the dissenting bondholders intended "to raise questions of substantive law only." But it also specified as errors, *inter alia,* the inclusion of stockholders in a plan where they have no equity and the finding that the plan was "fair" and "equitable." Thereby the stipulation adequately reserved the question of law as to whether

on these facts the plan was fair and equitable within the meaning of § 77B. But in any event a stipulation does not foreclose legal questions. *Swift & Co.* v. *Hocking Valley Ry. Co.,* 243 U. S. 281, 289.

On that question of law we think that the District Court erred in confirming the plan and that the Circuit Court of Appeals erred in affirming that decree. We think that as a matter of law the plan was not fair and equitable.

At the outset it should be stated that where a plan is not fair and equitable as a matter of law it cannot be approved by the court even though the percentage of the various classes of security holders required by § 77B (f) for confirmation of the plan has consented. It is clear from a reading of § 77B (f)[6] that the Congress has required both that the required percentages of each class of security holders approve the plan and that the plan be found to be "fair and equitable." The former is not a substitute for the latter. The court is not merely a ministerial register of the vote of the several classes of security holders. All those interested in the estate are entitled to the court's protection. Accordingly the fact that the vast majority of the security holders have approved the plan is not the test of whether the plan is a fair and equitable one. This is in line with the decision of this Court in *Taylor* v. *Standard Gas & Electric Co.,* 306 U. S. 307, which reversed an order approving a plan of reorganization under § 77B, in spite of the fact that the requisite percentage of the various classes of

---

[6] It provides in part: "After hearing such objections as may be made to the plan, the judge shall confirm the plan if satisfied that (1) it is fair and equitable and does not discriminate unfairly in favor of any class of creditors or stockholders, and is feasible; (2) it complies with the provisions of subdivision (b) of this section; (3) it has been accepted as required by the provisions of subdivision (e), clause (1) of this section; . . ."

security holders had approved it, on the ground that preferred stock of the debtor corporation was inequitably treated under the plan. The contrary conclusion in such cases would make the judicial determination on the issue of fairness a mere formality and would effectively destroy the function and the duty imposed by the Congress on the district courts under § 77B. That function and duty are no less here than they are in equity receivership reorganizations, where this Court said, "Every important determination by the court in receivership proceedings calls for an informed, independent judgment." *National Surety Co.* v. *Coriell,* 289 U. S. 426, 436.

Hence, in this case the fact that 92.81% in amount of the bonds, 99.75% of the Class A stock, and 90% of the Class B stock have approved the plan is as immaterial on the basic issue of its fairness as is the fact that petitioners own only $18,500 face amount of a large bond issue.

The words "fair and equitable" as used in § 77B(f) are words of art which prior to the advent of § 77B had acquired a fixed meaning through judicial interpretations in the field of equity receivership reorganizations. Hence, as in case of other terms or phrases used in that section, *Duparquet Huot & Moneuse Co.* v. *Evans,* 297 U. S. 216, we adhere to the familiar rule that where words are employed in an act which had at the time a well known meaning in the law, they are used in that sense unless the context requires the contrary. *Keck* v. *United States,* 172 U. S. 434, 446.

In equity reorganization law the term "fair and equitable" included, *inter alia,* the rules of law enunciated by this Court in the familiar cases of *Railroad Co.* v. *Howard,* 7 Wall. 392; *Louisville Trust Co.* v. *Louisville, N. A. & C. Ry. Co.,* 174 U. S. 674; *Northern Pacific Ry. Co.* v. *Boyd,* 228 U. S. 482; *Kansas City Terminal Ry. Co.* v. *Central Union Trust Co.,* 271 U. S. 445. These cases dealt with the precedence to be accorded

creditors over stockholders in reorganization plans.[7] In *Louisville Trust Co.* v. *Louisville, N. A. & C. Ry. Co.,* *supra,* this Court reaffirmed the "familiar rule" that "the stockholder's interest in the property is subordinate to the rights of creditors; first of secured and then of unsecured creditors." And it went on to say that "any arrangement of the parties by which the subordinate rights and interests of stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation" (p. 684). This doctrine is the "fixed principle" according to which *Northern Pacific Ry. Co.* v. *Boyd, supra,* decided that the character of reorganization plans was to be evaluated. And in the latter case this Court added, "If the value of the road justified the issuance of stock in exchange for old shares, the creditors were entitled to the benefit of that value, whether it was present or prospective, for dividends or only for purposes of control. In either event it was a right of property out of which the creditors were entitled to be paid before the stockholders could retain it for any purpose whatever." (p. 508.) On the reaffirmation of this "fixed principle" of reorganization law in *Kansas City Terminal Ry. Co.* v. *Central Union Trust Co., supra,* it was said that "to the extent of their debts creditors are entitled to priority over stockholders against all the property of an insolvent corporation" (p. 455).

---

[7] For analyses and reviews of these cases as applied to equity reorganizations or reorganizations under § 77B and § 77 of the Bankruptcy Act see Frank, Some Realistic Reflections on Some Aspects of Corporate Reorganization, 19 Va. L. Rev. 541; Swaine, Reorganization of Corporations: Certain Developments of the Last Decade, 27 Col. L. Rev. 901; Spaeth and Winks, The Boyd Case and Section 77, 32 Ill. L. Rev. 769; Bonbright and Bergerman, Two Rival Theories of Priority Rights of Security Holders in a Corporate Reorganization, 28 Col. L. Rev. 127; Friendly, Some Comments on the Corporate Reorganization Act, 48 Harv. L. Rev. 39; 2 Gerdes on Corporate Reorganizations, § 1084.

In application of this rule of full or absolute priority this Court recognized certain practical considerations and made it clear that such rule did not "require the impossible and make it necessary to pay an unsecured creditor in cash as a condition of stockholders retaining an interest in the reorganized company. His interest can be preserved by the issuance, on equitable terms, of income bonds or preferred stock." *Northern Pacific Ry. Co.* v. *Boyd, supra,* p. 508. And this practical aspect of the problem was further amplified in *Kansas City Terminal Ry. Co.* v. *Central Union Trust Co., supra,* by the statement that "when necessary, they (creditors) may be protected through other arrangements which distinctly recognize their equitable right to be preferred to stockholders against the full value of all property belonging to the debtor corporation, and afford each of them fair opportunity, measured by the existing circumstances, to avail himself of this right" (pp. 454–455). And it also recognized the necessity at times of permitting the inclusion of stockholders on payment of contributions, even though the debtor company was insolvent. As stated in *Kansas City Terminal Ry. Co.* v. *Central Union Trust Co., supra,* p. 455: "Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights." But even so, payment of cash by the stockholders for new stock did not itself save the plan from the rigors of the "fixed principle" of the *Boyd* case, for in that case the decree was struck down where provision was not made for the unsecured creditor and even though the stockholders paid cash for their new stock. Sales pursuant to such plans were void, even though there was no fraud

in the decree. *Northern Pacific Ry. Co.* v. *Boyd, supra,* p. 504. As this Court there stated, p. 502, "There is no difference in principle if the contract of reorganization, instead of being effectuated by private sale, is consummated by a master's deed under a consent decree."

Throughout the history of equity reorganizations this familiar rule was properly applied in passing on objections made by various classes of creditors that junior interests were improperly permitted to participate in a plan or were too liberally treated therein. In such adjudications the doctrine of *Northern Pacific Ry. Co.* v. *Boyd, supra,* and related cases, was commonly included in the phrase "fair and equitable" or its equivalent. As we have said, the phrase became a term of art used to indicate that a plan of reorganization fulfilled the necessary standards of fairness. Thus throughout the cases in this earlier chapter of reorganization law, we find the words "equitable and fair," [8] "fair and equitable," [9] "fairly and equitably treated," [10] "adequate and equitable," [11] "just, fair and equitable" [12] and like phrases [13] used to include the "fixed principle" of the *Boyd* case, its antecedents and

[8] *Jameson* v. *Guaranty Trust Co.,* 20 F. 2d 808, 815, certiorari denied 275 U. S. 569.

[9] *Flershem* v. *National Radiator Corp.,* 64 F. 2d 847, 852, rev'd 290 U. S. 504.

[10] *P. R. Walsh Tie & Timber Co.* v. *Missouri Pacific Ry. Co.,* 280 F. 38, 44.

[11] *Mountain States Power Co.* v. *A. L. Jordan Lumber Co.,* 293 F. 502, 506.

[12] *St. Louis-San Francisco Ry. Co.* v. *McElvain,* 253 F. 123, 134. See also *Guaranty Trust Co.* v. *Missouri Pacific Ry. Co.,* 238 F. 812, 816, 819.

[13] *Northern Pacific Ry. Co.* v. *Boyd, supra,* spoke of a "fair" offer to the creditor and a "just reorganization" as the prerequisite to validity of the plan (p. 508). *Kansas City Terminal Ry. Co.* v. *Central Union Trust Co., supra,* said that the offer to the creditor had to be "fair and binding" (p. 452).

its successors. Hence we conclude, as have other courts,[14] that that doctrine is firmly imbedded in § 77B.

We come then to the legal question of whether the plan here in issue is fair and equitable within the meaning of that phrase as used in § 77B.

We do not believe it is, for the following reasons. Here the court made a finding that the debtor is insolvent not only in the equity sense but also in the bankruptcy sense. Admittedly there are assets not in excess of $900,000, while the claims of the bondholders for principal and interest are approximately $3,800,000. Hence even if all of the assets were turned over to the bondholders they would realize less than 25 percent on their claims. Yet in spite of this fact they will be required under the plan to surrender to the stockholders 23 percent of the value of the enterprise.

True, the relative priorities of the bondholders and the old Class A stockholders are maintained by virtue of

---

[14] See *In re Day & Meyer, Murray & Young,* 93 F. 2d 657; *Tellier* v. *Franks Laundry Co.,* 101 F. 2d 561; *In re Philadelphia & Reading Coal & Iron Co.,* 105 F. 2d 357; *In re New York Railways Corp.,* 82 F. 2d 739, 744; 2 Gerdes on Corporate Reorganizations, § 1085. Intimations to the contrary, *Downtown Investment Assn.* v. *Boston Metropolitan Buildings, Inc.,* 81 F. 2d 314, 323–324; *In re A. C. Hotel Co.,* 93 F. 2d 841, are not tenable.

The statutory scheme of § 77B (in those respects which are material here) is in sharp contrast to that which was provided for compositions under former § 12. This Court said in *Callaghan* v. *Reconstruction Finance Corp.,* 297 U. S. 464, 470: "Reorganizations now permitted under § 77B present certain resemblances to compositions under § 12, which have been commented upon as supporting the constitutionality of the reorganization provisions of § 77 or § 77B. . . . But § 77B contemplates a procedure and results not permissible under § 12. Reorganizations are nowhere referred to in the statute as compositions." Under § 12 (a) (as it existed at the time § 77B was enacted) only a "bankrupt" could offer "terms of composition to his creditors." Under § 77B (d) plans may be proposed not only by the debtor but also by a designated percentage of the creditors or, where

the priorities accorded the preferred stock which the bondholders are to receive. But this is not compliance with the principle expressed in *Kansas City Terminal Ry. Co.* v. *Central Union Trust Co., supra,* that "to the extent of their debts creditors are entitled to priority over stockholders against all the property of an insolvent corporation," for there are not sufficient assets to pay the bondholders the amount of their claims. Nor does this plan recognize the "equitable right" of the bond-holders "to be preferred to stockholders against the full value of all property belonging to the debtor corporation," within the meaning of the rule announced in that case, since the full value of that property is not first applied to claims of the bondholders before the stock-holders are allowed to participate. Rather it is partially diverted for the benefit of the stockholders even though the bondholders would obtain less than 25% payment if they received it all. Under that theory all classes of

---

the debtor is not found to be insolvent, by a specified percentage of stockholders. Section 12 (d) as it then existed provided that the judge "shall confirm a composition if satisfied" *inter alia* that "it is for the best interests of the creditors." See *Fleischmann & Devine, Inc.* v. *Saul Wolfson Dry Goods Co.,* 299 F. 15. The "fair and equitable" standard employed in § 77B was not then present in § 12. Consent by the debtor to the composition was implicit in former § 12 (cf. *In re Bryer,* 281 F. 812). But under § 77B approval of a plan by security holders who have no equity in the enterprise is unnecessary. *In re 620 Church Street Building Corp.,* 299 U. S. 24. The general view was well expressed in *In re Dutch Woodcraft Shops,* 14 F. Supp. 467, 469, "The preservation of business enterprises must not be at the expense of creditors, and the provisions of section 77B should not be taken advantage of to effect what, in fact, amounts to a composition under section 12."

The Chandler Act, c. 10 (52 Stat. 840) approved June 22, 1938, now supplants § 77B. Various substantial changes in the provisions of § 77B have been made therein. But the standard of "fair and equitable" as used in § 77B remains unaltered as one of the criteria necessary for confirmation of a plan of reorganization. § 221 (2).

security holders could be perpetuated in the new company even though the assets were insufficient to pay—in new bonds or stock—the amount owing senior creditors. Such a result is not tenable.

It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. This Court, as we have seen, indicated as much in *Northern Pacific Ry. Co.* v. *Boyd, supra,* and *Kansas City Terminal Ry. Co.* v. *Central Union Trust Co., supra.* Especially in the latter case did this Court stress the necessity, at times, of seeking new money "essential to the success of the undertaking" from the old stockholders.[15] Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made. But if these conditions are not satisfied the stockholder's participation would run afoul of the ruling of this Court in *Kansas City Terminal Ry. Co.* v. *Central Union Trust Co., supra,* that "Whenever assessments are demanded, they must be adjusted with the purpose of according to the creditor his full right of priority against the corporate assets, so far as possible in the existing

---

[15] This new money was commonly necessary in equity reorganizations not only to provide new working capital but also to pay dissenting creditors. See Weiner, Conflicting Functions of the Upset Price in a Corporate Reorganization, 27 Col. L. Rev. 132.

Like considerations are relevant in reorganizations under § 77B. As stated by the court in *In re Dutch Woodcraft Shops,* 14 F. Supp. 467, 471:

"Circumstances may exist where the success of an undertaking requires that new money be furnished and where the former stockholders are the only or most feasible source of the new capital. In such instances, the court may recognize as fair and equitable a plan which includes contributions of new money by stockholders, provided it satisfactorily appears that full recognition has been given to the value of creditors' claims against the property."

circumstances" (p. 456). If, however, those conditions we have mentioned are satisfied, the creditor cannot complain that he is not accorded "his full right of priority against the corporate assets." If that were not the test, then the creditor's rights could be easily diluted by inadequate contributions by stockholders. To the extent of the inadequacy of their contributions the stockholders would be in precisely the position which this Court said in *Northern Pacific Ry. Co.* v. *Boyd, supra,* the stockholders there were in, viz., "in the position of a mortgagor buying at his own sale" (p. 504).

In view of these considerations we believe that to accord "the creditor his full right of priority against the corporate assets" where the debtor is insolvent, the stockholder's participation must be based on a contribution in money or in money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder.

The alleged consideration furnished by the stockholders in this case falls far short of meeting those requirements.

1. The findings below that participation by the old Class A stockholders will be beneficial to the bondholders because those stockholders have "financial standing and influence in the community" and can provide a "continuity of management" constitute no legal justification for issuance of new stock to them. Such items are illustrative of a host of intangibles which, if recognized as adequate consideration for issuance of stock to valueless junior interests, would serve as easy evasions of the principle of full or absolute priority of *Northern Pacific Ry. Co.* v. *Boyd, supra,* and related cases. Such items, on facts present here, are not adequate consideration for issuance of the stock in question. On the facts of this case they cannot possibly be translated into money's worth reasonably equivalent to the participation accorded the old stockholders. They have no place in the asset

column of the balance sheet of the new company. They reflect merely vague hopes or possibilities.[16] As such, they cannot be the basis for issuance of stock to otherwise valueless interests. The rigorous standards of the absolute or full priority doctrine of the *Boyd* case will not permit valueless junior interests to perpetuate their position in an enterprise on such ephemeral grounds.[17]

2. The District Court's further finding that if the bondholders were to foreclose now they would receive "substantially less than the present appraised value" of the assets of the debtor corporation is no support for inclusion of the old stockholders in the plan. The fact that bondholders might fare worse as a result of a foreclosure and liquidation than they would by taking a debtor's plan under § 77B can have no relevant bearing on whether a proposed plan is "fair and equitable" under that section. Submission to coercion is not the application of "fair and equitable" standards. Such a proposition would not only drastically impair the standards of "fair and equitable" as used in § 77B; it would pervert

---

[16] On comparable facts a like conclusion was reached in *In re Barclay Park Corp.,* 90 F. 2d 595, where the court said, p. 598:

"It is argued that the stockholders represent the present management of the hotel and that the management is valuable and indeed necessary to the enterprise and that the manager-stockholders will 'walk out' if the proposed plan does not go through and leave the hotel to its fate. But there is no binding agreement on their part to remain which might afford a justification for giving them a stock interest and, if their managerial skill is vital to the success of the hotel, any stock issued to insure the continuance of their relation ought to go to those stockholders who are of use to the enterprise and agree to act in its behalf, and not to all stockholders as such. Indeed, the supposed advantages of retaining the existing management seem to be a matter of inference, if not of speculation, supported by the oral statements of attorneys instead of by testimony."

[17] This conclusion is reëmphasized here by the fact that not all of the Class A stockholders who receive new stock are part of the management of the debtor.

the function of that Act. One of the purposes of § 77B was to avoid the consequences to debtors and creditors of foreclosures, liquidations, and forced sales with their drastic deflationary effects.[18] To hold that in a § 77B reorganization creditors of a hopelessly insolvent debtor may be forced to share the already insufficient assets with stockholders because apart from rehabilitation under that section they would suffer a worse fate, would disregard the standards of "fair and equitable"; and would result in impairment of the Act to the extent that it restored some of the conditions which the Congress sought to ameliorate by that remedial legislation.

3. The conclusion of the District Court that the virtual abrogation of the agreement deferring foreclosure until 1944 ("the principal valuable consideration" given to the bondholders by the stockholders) justified participation by the stockholders in the plan is likewise erroneous.

What were the rights of the bondholders under the supplemental indenture executed in 1930 we cannot determine. That indenture is not in the abbreviated record before us. The District Court found that for all practical purposes the bondholders could not foreclose until 1944. From the findings below we conclude that that followed as a consequence of making interest payable only if earned. On this record it does not appear whether or not there might be other events of default—such as non-payment of sinking funds—giving bondholders or the trustee the right to foreclose or giving bondholders or the trustee the right to accelerate the maturity of the bonds so that suits could be brought thereon. Hence, we must assume, as the District Court found, that the bondholders and the trustee could not take possession

---

[18] See H. R. Rep. No. 1409, 75th Cong., 1st Sess., p. 38, dealing with recent amendments to the section; and H. R. Rep. No. 194, 73rd Cong., 1st Sess., p. 2, the report accompanying the original Act.

of the property through foreclosure or otherwise until the maturity of the bonds. And as a corollary thereof we likewise assume that the stockholders, at least so far as the bondholders were involved, could keep their management group in possession and control until that time. And we assume that this right or power on the part of the stockholders to keep possession until 1944 was for them a thing of value, though there is no finding that the old stock had any value, present or prospective.

But we cannot conclude that that right survived the commencement of the proceedings under § 77B. A debtor as well as a creditor who invokes the aid of the federal courts in reorganization or rehabilitation under § 77B assumes all of the consequences which flow from that jurisdiction. Once the property is in the hands of the court private rights as respect that *res* are subject to the superior dominion of the court and are to be adjudicated pursuant to the standards prescribed by the Congress. As a result of such proceedings the hand of all executions or levies may be stayed.[19] The court acquires "exclusive jurisdiction of the debtor and its property wherever located for the purposes of this section."[20] The court need not keep the debtor in possession but may substitute for the old management a trustee; or if the old management is retained it operates the business "subject at all times to the control of the judge, and to such limitations, restrictions, terms, and conditions as the judge may from time to time impose and prescribe."[21] Thus, while the property remains in the hands of the court, as it does until dismissal or final decree on confirmation, the debtor, though left in pos-

---

[19] § 77B (a), (c) (10). Cf. *Continental Illinois Nat. Bank Co.* v. *Chicago, R. I. & P. Ry. Co.*, 294 U. S. 648.

[20] § 77B (a).

[21] § 77B (c).

session by the judge, does not operate it, as it did before the filing of the petition, unfettered and without restraint. The control of the court is then pervasive.[22] Furthermore, stockholders and other junior interests may be excluded from any plan of reorganization if the court finds that the debtor is insolvent. *In re 620 Church Street Building Corp.*, 299 U. S. 24. And on facts such as exist here, these junior interests must be excluded unless they furnish adequate consideration for the interest which they obtain in the new company. And once the jurisdiction of the court has been invoked, whether by the debtor or by a creditor, that petitioner cannot withdraw and oust the court of jurisdiction.[23] He in-

---

[22] See, 1 Gerdes on Corporate Reorganizations, c. 9. These powers embrace not only the specifically enumerated powers contained in § 77B but also "all the powers, not inconsistent with this section, which a Federal court would have had it appointed a receiver in equity of the property of the debtor by reason of its inability to pay its debts as they mature." § 77B (a). In addition, by virtue of § 77A the district court, as a court of bankruptcy, has original jurisdiction in proceedings under § 77B. Illustrative of specific powers granted by § 77B are the powers of the court to authorize issuance of certificates (§ 77B (c) (3)), to require the filing of schedules and reports (§ 77B (c) (4)), to direct rejection of executory contracts (§ 77B (c) (5)), to control salaries of officers and to approve appointments "to any office" (§ 77B (c)). The last subsection also provides, "In case a trustee is not appointed, the debtor shall continue in the possession of its property, and, if authorized by the judge, shall operate the business thereof during such period, fixed or indefinite, as the judge may from time to time prescribe, and shall have all the title to and shall exercise, consistently with the provisions of this section, all the powers of a trustee appointed pursuant to this section, subject at all times to the control of the judge, and to such limitations, restrictions, terms, and conditions as the judge may from time to time impose and prescribe." In the instant case the court left the debtor in possession, allowing its officers no salaries but allowing specified salaries to be paid to designated officers of the principal subsidiary.

[23] The Act has explicit standards for dismissal (§ 77B (c) (8)) which we discuss hereafter.

vokes that jurisdiction risking all of the disadvantages which may flow to him as a consequence, as well as gaining all of the benefits. One of those disadvantages from the viewpoint of the debtor and its stockholders is the approval of a plan of reorganization which eliminates them completely.[24] Accordingly, respondent's assertion in this case that the major contribution of these stockholders justifying their inclusion in the plan was the waiver of their right to defer or put off foreclosure until 1944, i. e., to remain in possession, does not stand analysis. The right to remain in unmolested dominion and control over the property was necessarily waived or abandoned on invoking the jurisdiction of the federal courts in these proceedings. When that jurisdiction attached, the court rather than the stockholders was in control with all of the powers and duties which that entailed under § 77B. Certainly the surrender of a right thus waived is not adequate consideration for the dilution of the bondholders' priorities which this plan would effect.

And there is a further reason why this result necessarily follows, if the will of the Congress as expressed in § 77B is not to be thwarted and if the integrity of such proceedings is to be maintained. As we have said, this plan had its origin in an endeavor on the part of the debtor in 1937 to effect a voluntary reorganization. A plan was proposed by the debtor which was the same as that here involved except for the amount and nature of the stock to be received by the bondholders.[25] That plan

---

[24] As recognized in *In re 620 Church Street Building Corp., supra,* § 77B (e) (1) expressly takes care of this contingency in the provision that acceptance of the plan by a majority of the stock "shall not be requisite to the confirmation of the plan by any stockholder or class of stockholders (1) if the judge shall have determined" *inter alia* that "the debtor is insolvent."

[25] Under that plan the new company was to have an authorized capital of $1,000,000 consisting of 1,000,000 shares of a par value of

contained two methods for its consummation. The first was by means of an amendment to the trust indenture and a recapitalization of the debtor, a method to be followed if the board felt that sufficient approvals had been obtained. The second was by means of §77B. Over 80% of the bondholders and over 90% of the stock approved the original plan. Thereupon the debtor filed its petition in §77B. Thereafter, the debtor filed a modification of the plan to which the assents, here relied upon, were obtained.[26] Thus respondent argues that since the plan of reorganization was entered into between the bondholders and the stockholders before institution of the reorganization proceedings under §77B, the consideration flowing from the stockholders had been furnished and the interests of the bondholders and stockholders in the assets of the debtor had been fixed prior to the filing of the petition. In fact, respondent frankly insists that the stockholders' "right of participation was secured by contract before, and as a condition precedent to, the institution of the 77B proceedings."

But the mere statement of this proposition is its own refutation. If the reorganization court were bound by such conventions of the parties, it would be effectively ousted of important duties which the Act places on it. Federal courts acting under §77B would be required to place their imprimatur on plans of reorganization which disposed of the assets of a company not in accord with the standards of "fair and equitable" but in compliance with agreements which the required percentages of secu-

---

$1.00 per share, the bondholders getting 590,065 of the shares and the old Class A stockholders getting 239,935 of the shares. Shares going to the bondholders were of the same class as those received by stockholders.

[26] These assents were apparently measured by the failure of the bondholders to withdraw their consents which had been given to the original plan, on receiving copies of the proposed modification.

rity holders had previously made. Such procedure would deprive scattered and unorganized security holders of the protection which the Congress had provided them under § 77B. The scope of the duties and powers of the Court would be delimited by the bargain which reorganizers had been able to make with security holders before they asked the intercession of the court in effectuating their plan. Minorities would have their fate decided not by the court in application of the law of the land as prescribed in § 77B, but by the forces utilized by reorganizers in prescribing the conditions precedent on which the benefits of the statute could be obtained. No conditions precedent to enjoyment of the benefits of § 77B can be provided except by the Congress. To hold otherwise would be to allow reorganizers to rewrite it so as to best serve their own ends.[27]

4. The holding of the District Court that the value to the bondholders of maintaining the debtor as a going concern and of avoiding litigation with the old stockholders justifies the inclusion of the latter in the plan is likewise erroneous. The conclusion of the District Court that avoidance of litigation with the stockholders gave validity to their claim for recognition in the plan involves a misconception of the duties and responsibilities of the court in these proceedings. Whatever might be the strategic or nuisance value of such parties outside of § 77B is irrelevant to the duties of the court in confirming or disapproving a plan under that section. In these proceedings there is no occasion for the court to yield to such pressures. If the priorities of creditors which the law

---

[27] Cf. *Hollister* v. *Stewart,* 111 N. Y. 644; 19 N. E. 782, where the court struck down a voluntary reorganization which attempted to bind minority bondholders. The court said "Unless railroad syndicates or committees are to be put above the Constitution, the trustees cannot set aside and change their contract with plaintiff, of their own volition, without his consent." (p. 660.)

protects are not to be diluted, it is the clear duty of the court to resist all such assertions. Of course, this is not to intimate that compromise of claims is not allowable under § 77B. There frequently will be situations involving conflicting claims to specific assets which may, in the discretion of the court, be more wisely settled by compromise rather than by litigation. Thus, ambiguities in the wording of two indentures may make plausible the claim of one class of creditors to an exclusive or prior right to certain assets as against the other class in spite of the fact that the latter's claim flows from a first mortgage.[28] Close questions of interpretations of after-acquired property clauses in mortgages, preferences in stock certificates, divisional mortgages and the like will give rise to honest doubts as to which security holders have first claim to certain assets. Settlement of such conflicting claims to the *res* in the possession of the court is a normal part of the process of reorganization. In sanctioning such settlements the court is not bowing to nuisance claims; it is administering the proceedings in an economical and practical manner. But that is not the situation here. As a result of the filing of the petition in this case, the court, not the stockholders, acquired exclusive dominion and control over the estate. Hence, any strategic position occupied by the stockholders prior to these proceedings vanished once the court invoked its jurisdiction. Threats by stockholders of the kind here in question are merely threats to the jurisdiction of the

---

[28] That would appear to be essentially the type of case involved in *In the Matter of Detroit International Bridge Co., Debtor*, No. 24131, U. S. D. C. E. D. Mich., cited to us by the respondent and described in an advisory report (Corporate Reorganization Release No. 9) submitted by the Securities and Exchange Commission pursuant to § 172, c. X of the Chandler Act. However, the action of the court, if any, on the plan has not yet appeared in the published reports.

court, which jurisdiction these selfsame stockholders invoked for their benefit when they caused the debtor's petition to be filed. Consequently, these claims of the stockholders are, as we have said, entitled to no more dignity than any claim based upon sheer nuisance value.

In this connection it should be observed that the finding of the court that it was important to admit the stockholders to participation in the plan so as to maintain the debtor as a going concern and thus protect the bondholders was based upon a misconception of its legal powers and duties. For the court assumed that the only alternative to acceptance of this debtor's plan was a dismissal of the proceeding or a liquidation. But this is not true. In the first place, no special perquisites (of consequence here) flow to stockholders by virtue of the fact that the proceedings are instituted by a voluntary rather than an involuntary petition. The criteria for exclusion or inclusion of stockholders in a plan are precisely the same in both situations. In practice it is not infrequent to find proceedings which start with a debtor's petition ending up with plans of reorganization which exclude stockholders. *Reading Hotel Corp.* v. *Protective Committee*, 89 F. 2d 53. In the second place failure to accept this plan does not force dismissal or liquidation. Section 77B(c)(8) gives the court explicit powers where "a plan of reorganization is not proposed or accepted within such reasonable period as the judge may fix" either to "extend such period" or to "dismiss the proceeding" or, with exceptions not relevant here, to cause liquidation, such choice to be made "as the interests of the creditors and stockholders may equitably require." Accordingly, dismissal has not infrequently been properly denied. *In re Bush Terminal Co.*, 84 F. 2d 984. And in this case there has been no showing that a plan which is not only fair and equitable but also meets the other

requirements of the Act cannot be adopted nor that all reasonable time for proposal of such alternative plans has expired.

We therefore hold that the plan is not fair and equitable and that the judgment below must be and is

*Reversed.*

Mr. Justice Butler took no part in the consideration or disposition of this case.