In re **MISSION HEIGHTS INVESTORS LIMITED PARTNERSHIP, an Arizona Limited Partnership, Debtor.**

**Richard S. CLARKE, a Married Man in His Sole and Separate Capacity; Dan W. Clarke, Jr., a Married Man in His Sole and Separate Capacity; and Margaret A. Kelly, a Married Woman in Her Sole and Separate Capacity, Plaintiffs,**

v.

**MISSION HEIGHTS INVESTORS, INC., an Arizona Corporation; and Mission Heights Investors Limited Partnership, an Arizona Limited Partnership, Defendants.**

Bankruptcy No. 89–3507 TUC LO.
Adv. No. A94–0219.

United States Bankruptcy Court,
D. Arizona.

Sept. 11, 1996.

Order Supplementing Decision
Sept. 25, 1996.

Mark L. Collins, Tucson, AZ, and Michael D. Stofko, Tucson, AZ, for Plaintiffs.

George J. Feulner, Tucson, AZ, for Mission Heights Investors, Inc.

Eric Slocum Sparks, Tucson, AZ, for Mission Heights Investors Limited Partnership.

## MEMORANDUM DECISION

JAMES M. MARLAR, Bankruptcy Judge.

The trial in this matter came on regularly for hearing on the 31st day of July, and the 1st day of August, 1996. After considering all of the evidence, exhibits, briefs, witness testimony, applicable law, and arguments of counsel, the Court now rules.

### *PROCEDURAL INTRODUCTION*

At the beginning of the hearing, the parties stated that the trial should be divided into two phases: (1) a determination of the value of the contributed assets, and (2) all other issues. The Court then heard the testimony of three persons on the first issue, and the parties submitted the matter for decision. The parties suggested that, depending on the outcome, the issues for the second phase of the case would come into sharper focus, and could then be decided either with additional testimony, or upon stipulated facts and legal argument.

### *ISSUES*

The parties have identified the following as the issues to be decided in this phase of the litigation:

1. whether or not assets were transferred to, or for the benefit of, the debtor;
2. what, if any, specific assets were transferred; and
3. the value of the assets, if any, transferred.

After listening to the evidence and considering other uncontested facts from the parties, the court believes that a threshold issue presents itself, and must be decided before the other three issues are discussed. That issue is:

If a reorganized debtor's new equity owners fail to contribute the plan's prescribed "new value" to the reorganized debtor, but nevertheless the plan is fully consummated and all creditors are paid pursuant to the

plan, can former equity, who elected not to contribute to, nor participate in the reorganized debtor, complain that a material default has taken place, which is therefore sufficient to cause dismissal under § 1112(b)(8)?

## JURISDICTION

This is a core proceeding. 28 *U.S.C.* § 157(b)(2)(L). This Court has jurisdiction over this proceeding. 28 *U.S.C.* §§ 1334; 157(a).

## DISCUSSION

In any inquiry into whether there has been a material default under a confirmed plan, three elements must exist. First, there must be a confirmed plan; second, there must be a default thereunder; and third, any default must be material. The heart of the inquiry in this case will be found in the third element.

### 1. The Confirmed Plan

Judge Lawrence Ollason confirmed the debtor's plan of reorganization on May 24, 1992. (Debtor's Ex. 4). The plan which was confirmed was the debtor's Second Amended Plan of Reorganization (Debtor's Ex. 4, lines 15–16; debtor's Ex. 3). That plan provided for the following treatment of creditors and equity.

| CLASS | CREDITOR | AMOUNT | IMPAIRED | TREATMENT |
|---|---|---|---|---|
| 1 | Administrative | $40,000 | N/A | Cash at confirmation or as agreed by such creditors to be paid over time. |
| 2 | Tax claims of: | | | |
| | A) IRS | Unknown | N/A | Existing balance with accruing market rate of interest to be paid in full, |
| | B) Arizona | Unknown (Believed none exist) | N/A | over 6 years, annually |
| 3 | Secured Tax Liens for Real Property Taxes | Unknown | Yes | Retain lien, Paid in full in annual installments over six years. Interest to accrue at 9.75% |
| 4 | Mercury Savings and Loan (secured portion) | $3,500,000 | Yes | Retain lien to the extent of the value of the secured property. 30–year amortization of balance, with a 10–year balloon. Monthly payments. Interest fixed at a rate of 9.75% |
| 5 | Citibank (secured) | $3,000,000 | Yes | Surrender collateral. Any deficiency to be an unsecured class 7 claim |
| 6 | Mercury Savings & Loan (unsecured) | $2,300,000 | Yes | Will receive 30% and be treated as a class 13 creditor |
| 7 | Citibank (unsecured) | $1,050,000 | Yes | Will receive 30% and be treated as a class 13 creditor |
| 8 | Unsecured trade debt | $28,000 | Yes | Will receive 30% and be treated as a class 13 creditor |
| 9 | Daniel Clarke | $1,950,000 | Yes | 1) $1,000,000 will receive 30% and be treated as a class 13 creditor.<br>2) $950,000 shall be treated as a class 10 claim. |
| 10 | Schomac Financial | $686,000 | Yes | Will receive 26%, to be subordinate to class 13 claims. Paid from available net operating income. |

| CLASS | CREDITOR | AMOUNT | IMPAIRED | TREATMENT |
|---|---|---|---|---|
| *11 | Limited Partners | —— | Yes | Classes 11 and 12 will contribute $330,-000 in cash and property to the reorganized debtor. $50,000 in cash delivered at confirmation, and balance by "effective date" (final order). In order for a limited partner to retain any interest in the reorganized debtor, he must contribute the proportionate share of the $330,000 as such partner's percentage bears to the whole. Limited partners may not contribute more than $264,000 (80%) of the $330,000. Twenty percent of the contribution is reserved to the General Partner, which also holds a 20% limited partnership interest. If a limited partner elects not to contribute, then its interest in the reorganized debtor will be forfeited. Other partners can then elect to contribute the necessary funds and thereby increase their shares. |
| 12 | General Partner | | Yes | Retain interest only if it contributes cash or property up to $66,000, thereby retaining and/or obtaining 20% of the reorganized debtor. |
| 13 | Mercury Savings, Citibank, Unsecured creditors, Daniel Clarke | | | A payment pool will be funded from 1991–1996 revenues expected to generate an aggregate $1,312,000 to be shared pro-rata. |

The plan further provided that upon its confirmation, the assets would vest in the reorganized debtor. (Ex. 3, Art. VIII at 24). Pursuant to 11 *U.S.C.* § 1141(a), the provisions of a confirmed plan bind the creditors and equity holders. In addition, confirmation (except to the extent otherwise specified in the plan) "terminates all rights and interests of equity security holders and general partners provided for by the plan." 11 *U.S.C.* § 1141(d)(1)(B). No appeal was taken by any party, and the confirmation order of May 24, 1992 thus became final ten days after its entry. *Bankr.R. 8002.*

The plaintiffs in this case are the successors-in-interest to the position of Richard Clarke, the former 80% limited partner of the debtor. When Mr. Clarke was given the opportunity to participate in the plan and the reorganized debtor, pursuant to the treatment established for class 11 interests (limited partners), he declined. Thus, upon confirmation, the Clarke limited partnership interest was extinguished and forfeited.

### 2. Was there a Default Under a Confirmed Plan?

Over four years have now passed since the plan was confirmed. An exhibit, debtor's Ex. 10, reflected the status of payments to classes 1–10 as of October 12, 1994, as follows:

| CLASS | CREDITOR | PAYMENTS REQUIRED BY PLAN | PAYMENTS THROUGH 10/12/94 | BALANCE PAYABLE AT 10/12/94 |
|---|---|---|---|---|
| 1 | Administrative Claims | 13,965.51 | 13,965.51 | 0.00 |
| 2 | Claims of governmental units. City of Tucson assessment paid over 10 years with semi-annual payments (Assessment No. 128, Series 733) | 19,000.00 | 5,651.15 | 13,348.85 |
| 3 | Secured Ad Valorem Tax Claims (2nd half 1991) | 34,567.70 | 34,567.709 | 0.00 |

| CLASS | CREDITOR | PAYMENTS REQUIRED BY PLAN | PAYMENTS THROUGH 10/12/94 | BALANCE PAYABLE AT 10/12/94 |
|---|---|---|---|---|
| 4 | Secured Claim of Mercury Savings and Loan: | | | |
| | Principal | 4,000,000.00 | 880,644.62 | 3,119,355.38 |
| | Interest through 9/15/94 | 689,531.47 | 689,531.47 | 0.00 |
| 5 | Secured Claim of Citibank of Arizona, N.A. | 2,250,000.00 | 2,250,000.00 | 0.00 |
| 6 | Deficiency Claim of Mercury Savings and Loan | 540,000.00 | 540,000.00 | 0.00 |
| 7 | Deficiency Claim of Citibank of Arizona, N.A. | 315,000.00 | 315,000.00 | 0.00 |
| 8 | Unsecured Claims | 28,000.00 | 28,000.00 | 0.00 |
| 9 | Second Lien Secured Claim of Daniel Clarke | 300,000.00 | 300,000.00 | 0.00 |
| 10 | Insider Claim of Daniel Clarke | 247,000.00 | 247,000.00 | 0.00 |
| | Insider Claim of Schomac Financial, Inc. | 178,000.00 | 178,000.00 | 0.00 |
| | **TOTALS** | 8,615,064.68 | 5,482,360.45 | 3,132,704.23 |

In its trial memorandum, the defendants updated the status of payments to the present time, stating:

> The debtor has paid all allowed claims under the confirmed plan; full payment being made seven years early. There are no remaining obligations under the plan. Clearly, the plan has been substantially consummated.

(Trial Memorandum at 6, lines 3–6). In addition, on page 9 of the same memorandum, the defendants state that all payments to all creditor classes were completed at the end of the third year of the plan. When asked by the Court, plaintiffs acknowledged that this was so.

The material default under the plan, however, maintains the plaintiff, was the "new equity's" failure to contribute the promised cash or property in the value of $330,000 at or shortly after entry of the confirmation order.

It was on the value of the assets contributed, at or post-confirmation, that the Court heard testimony and was asked to review several exhibits in order to determine if the $330,000 "new value" was in fact contributed.

### 3. Was the Default "Material"?

■ Assuming *arguendo* that the "new equity" failed to make the entire, or even a substantial new value contribution, would this fact be "material" in view of the successful consummation of the plan and payment to all third-party creditors? In order to analyze this important element, further discussion is required.

### A. The Purpose of the "New Value Contribution"

The concept of a "new value contribution" is nowhere articulated in the Bankruptcy Code. Its roots, however, pre-date the Code and spring from a Bankruptcy Act case, *Case v. Los Angeles Lumber Company,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). That case had its origins in equity receivership law. *See, e.g., Northern P.R. Co. v. Boyd,* 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); R. Haines, "The True Paternity of Bonner Mall: Equivalent New Value Was

Never An Exception," *Norton Bankruptcy Law Advisor,* June, 1994.

*Case* and its progeny were the offspring of what has become known as the "absolute priority rule." In its essence, the absolute priority rule, expressed by current § 1129(b)(2)(B)(ii) as it relates to "unsecured claims," contains within itself the elements of what is now mis-titled as the "exception" to the absolute priority rule. From an academic standpoint, the rule *is* the rule, and it has no exception. "New value," if you will, is a corollary of the rule, not an exception.

 Stated simply, the absolute priority rule preserves a reorganization's going concern value for the benefit of its creditors. It does so by requiring owners, who wish to retain their interests in an ongoing enterprise, to contribute value to the reorganized debtor for the benefit of the creditors, in either "money or monies worth." That value must be (1) new, (2) necessary, (3) substantial and (4) be tangible as money or monies' worth. *Case, supra.* The "Equity" is not contributing new value to itself. The purpose of the contribution is to insure that *creditors,* not equity, realize the value of the enterprise to be retained by the owners, the "going concern value." New value is simply a recognition that a going concern is more valuable than a moribund operation whose assets are piecemealed and liquidated and that such value belongs to the creditors, not the equity owners.

 The absolute priority rule's requirement of a new value contribution is intended for the protection of creditors, not insider equity participants. *See, generally, In re Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *In re Bonner Mall Partnership,* 2 F.3d 899 (9th Cir.1993), *cert. granted* 510 U.S. 1039, 114 S.Ct. 681, 126 L.Ed.2d 648, motion to vacate den. and dismissed, —— U.S. ——, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994); 4 *Norton Bankruptcy Law and Practice 2d* § 93.12—93.13 (1994); J. Pearson, "New Value: Doctrine, Exception or Delusion," *Norton Bankruptcy Law Advisor,* Jan. 1994.

### B. The Plan is Final

The balloting for and against the Plan was:

| CLASS | CREDITOR | VOTE |
| --- | --- | --- |
| 1 | Administrative | N/A |
| 2 | Governmental | None |
| 3 | Pima County (secured) | Reject |
| 4 | Mercury Savings (secured) | Reject |
| 5 | Citibank (secured) | Accept |
| 6 | Mercury Savings (deficiency) | Reject |
| 7 | Citibank (deficiency) | Accept |
| 8 | Unsecured | Accept |
| 9 | Clarke (secured) | Accept |
| 10 | Schomac (secured) | Accept |
| 11 | Limited Partners | Accept |
| 12 | General Partners | Accept |
| 13 | Classes 6, 7, 8, 9 | N/A |

(Dkt. 207)

On May 24, 1992, the Plan was confirmed. No appeals were taken, and therefore the Plan became final 10 days later, on June 4, 1992. *Bankr.R.* 8002(a).

Almost two and one-half years later, on November 18, 1994, the Clarke heirs, in their capacity as Class 11 limited partners who, pre-confirmation, owned an 80% limited partnership interest in the debtor, filed the instant lawsuit. The relief requested was a reinstatement of their equity interest, participation in all profits realized since confirmation, and for an accounting (Adv. 94–219, Dkt. 219–2). In its essence, the complaint maintained that the general partner of the debtor obtained its 100% interest in the reorganized debtor by a false promise that it would infuse $330,000 in cash and property, but in fact never made such a contribution. As a consequence, the Clarke interest was squeezed out of participation in the now profitable and plan-debt-free enterprise.

*(i) The plan may only be revoked for fraud, and then only if the request is made within six months after confirmation*

 First, the last date to challenge the confirmed plan was November 24, 1992, 180 days after the entry of the confirmation order. § 1144. This is because a confirmation order can be set aside "if and only if such order was procured by fraud." *In re A.J. Mackay Co.,* 50 B.R. 756 (Bankr.D.Utah

**138**

1985). The allegations of the complaint appear to sound in tort, and specifically fraud. In essence, the plaintiffs maintain that the current owners misled them into believing that they were going to contribute $330,000, but then never did so.

Since the Code allows for confirmation orders to be set aside if challenges are brought within 180 days, it was incumbent upon Clarke to police the progress of the plan and insure that the other partners complied with their confirmation promise.

■■■■ Section 1144, allowing for plan revocation on fraud grounds, contains a short six-month window. Fraud must be pled and proven. *In re Nyack Autopartstores Holding Co.*, 98 B.R. 659 (Bankr.S.D.N.Y.1989). Collateral attacks on a confirmation order, specifying legal theories other than fraud, will not lie. *In re Hotel Corp. of the South v. Rampart 920, Inc.*, 46 B.R. 758 (E.D.La. 1985), *aff'd* 781 F.2d 901 (5th Cir.1986).

In the instant case, fraud was not alleged. It may be inferred, but it was neither alleged nor proven. The theory of recovery, to the extent identifiable, was essentially brought pursuant to § 1112, "material default under a confirmed plan." Thus, not being alleged nor proven, the confirmation order may not be revoked. *In re S.F. Cambridge Assoc.*, 135 B.R. 529 (Bankr.E.D.Tenn.1991).

■■■ Usually-accepted "discovery of the fraud" exceptions to a limitations period are not available to late confirmation challenges. *In re Crown–Globe, Inc.*, 107 B.R. 60 (Bankr. E.D.Pa.1989).

In any event, failing to bring its action in the time allowed by statute now bars the late challenge. Had plaintiffs done so within six months after plan confirmation, the issues which they now raise could be considered. However, their complaint was brought years too late.

*(ii) Clarke voluntarily withdrew from further participation*

■■■ Second, before the actual contribution ever became an issue, Clarke elected not to participate further. He walked away from the enterprise as a limited partner, presumably after deciding that he did not wish to throw good money after bad. Having made that decision, he thereafter had no further monetary interest in the debtor, and, except

for the limited fraud grounds specified above, now has neither a legal cause of action nor the legal standing to bring this action. As the Ninth Circuit Court of Appeals, quoting the U.S. Supreme Court, stated in *In re Pecan Groves of Arizona*, 951 F.2d 242 (9th Cir.1991):

> Only those persons who are directly and adversely affected pecuniarily by an order of the bankruptcy court have been held to have standing to appeal that order.

Clarke has not been injured by the other partners' failure to contribute the $330,000 "new value," again assuming *arguendo* that such a fact is true. He made his election in the context of the moment, and felt the price of continued participation was too dear. Having elected to stand fast, the plaintiffs cannot complain now that the debt-crippled enterprise has navigated itself to a safe landing. Clarke should have participated when asked, or complained within six months. The clarity of hindsight, two and one-half years later, does not create a legal remedy.

*(iii) Policy Precludes This Late Challenge*

■■■ The 180–day fraud exception has a purpose. It is to promote prompt and final disposition of a bankruptcy matter. Tardy petitions for relief cannot be maintained because the statute is jurisdictional. *In re S.F. Cambridge Assoc.*, 135 B.R. 529 (Bankr. E.D.Tenn.1991). Here, creditors have relied on the plan provisions, and have been paid. To dismiss the case now might require a disgorgement of substantial sums already paid out and a return to the *status quo ante*. This result would be inconsistent with the primary purpose of chapter 11—to pay creditors. Such a result would be against public policy in several respects: (1) there would never be finality in chapter 11 confirmation orders; (2) litigation would be prolonged indefinitely in an ever-changing financial landscape, (3) the six-month fraud exception would be rendered meaningless, and (4) parties who made legal choices would be able to change them at will without adverse consequences.

Sound policy reasons, therefore, also preclude the Clarke challenge.

*(iv) The Plan Has Been Fully Consummated*

■ Under bankruptcy law, a confirmed plan may be modified if it has not been substantially consummated. § 1127(b). "Substantial consummation" has several definitions, but the one applicable here is whether "distribution" has commenced under the plan. § 1101(2)(C). Here, substantial consummation has not only commenced, it has concluded, since all payments to creditors required under the plan have been made. Thus, not only substantial, but complete consummation has occurred. Since modification of the plan could not now occur, it is illogical and contrary to statutory policy that a revocation of the confirmed and consummated plan could be accomplished.

### C. Materiality

Turning again to the rationale for the absolute priority rule, as discussed in Section 3(A), above, the Court must consider whether the failure of the former general partner to contribute $330,000 now constitutes a material default.

If this default had been brought to the Court's attention within six months after confirmation, it would probably have been found to be material. At that time, perhaps fraud might have found, and the plan would not yet have been substantially consummated. The defect could have then been remedied, or the confirmation order set aside. The inquiries which the Court is now asked to make could have been made when the importance of the default could have been more easily shown.

Now, however, the claimed default is only technical, interesting history, but no longer a real issue. All creditors have been paid in accordance with the plan's provisions. The new value contribution, intended to cure operating shortfalls or used to supplement plan payments, is now unnecessary. Since all plan payments to creditors have been made, the absolute priority rule has been satisfied. The contribution is no longer necessary.

Even if the entire new contribution had been made, but had remained unused, it could now be distributed back to the contributing owners, or retained as an operational surplus, as the current owners saw fit. The contribution's original purpose, to protect creditors and the integrity of the absolute priority rule, no longer exist. Since the new value contribution would no longer serve any purpose, it follows that it is immaterial that it may never have been contributed in the first place.

As a matter of law, then, the non-contribution of new value is no longer material to the case. The issue, perhaps vital at the inception of the case, is now moot.

Because the value of the confirmation contribution is now immaterial, it is unnecessary to decide what its value was on the date it was allegedly contributed in mid–1992.

### CONCLUSION

For all the foregoing reasons, it is unnecessary to decide if the appropriate $330,000 value was ever contributed. Judgment shall therefore be entered in favor of the defendants and against the plaintiffs.

Counsel for the defendants shall lodge an appropriate form of judgment within 20 days, serving a copy upon plaintiffs' counsel.

### ORDER RE: MOTION FOR ADDITIONAL FINDINGS

The plaintiffs have asked the Court for additional findings concerning the value of the property contributed to the reorganized debtor.

For purposes of its opinion, the Court hypothetically assumed that the value of the contribution was *zero.* (See, Memorandum Decision at 13). This was the conclusion sought by the plaintiffs. However, even giving plaintiffs the benefit of a "best case" valuation, the Court nonetheless concluded, as a matter of law, that such a fact was no longer material since all creditors had been paid and that any "new value" contribution was intended to protect creditors, not partners or equity holders. Thus, the Court held that, in view of payment to the creditors, the exact value of the contribution was no longer material to the case, and therefore, that the plaintiffs' action was brought too late.

Although the parties identified value issues at the beginning of the case, the Court chose to first address certain threshold issues

which had to be decided before the parties' issues could be addressed.

Concluding that the plaintiffs had failed to meet the threshold tests, it was therefore unnecessary to proceed to decide value. After all, with the Court's hypothetical assumption that no value was ascribed to the contribution, the plaintiffs did not make their case on the *law*.

Finally, if an appeal succeeds, and this matter is remanded for further findings, the Court is confident that, with minimal effort, it can reach necessary value determination through use of its notes, a transcript, the exhibits and its memory.

For the foregoing reasons,

IT IS ORDERED denying plaintiffs' Motion for Additional Findings.