In re LEHIGH VALLEY R. CO. et al.

No. 21011.

District Court, E. D. Pennsylvania.

Aug. 7, 1940.

Maurice Bower Saul, Harry E. Sprogell, and Saul, Ewing, Remick & Saul, all of Philadelphia, Pa., for petitioners.

Robert T. Swaine, Littleton Groom, and Cravath, de Gersdorff, Swaine & Wood, all of New York City, for Bondholders' Committee.

W. Meade Fletcher, Jr., of Washington, D. C., for Reconstruction Finance Corporation.

Edward A. Kallick, U. S. Atty., and Thomas J. Curtin, Esq., Asst. U. S. Atty., both of Philadelphia, Pa., for U. S.

Hovey C. Clark, Curtis F. Heath, and Larkin, Rathbone & Perry, all of New York City, and Charles Myers, Robert V. Massey, Jr., and Barnes, Myers & Price, all of Philadelphia, Pa., for intervening banks and corporate trustees assentors to plan.

Meyer Abrams and Shulman, Shulman & Abrams, all of Chicago, Ill., Vincent A. O'Connor, of New York City, J. Howard Reber, of Philadelphia, Pa., Samuel P. Puner, Abraham Marcus, and Sabin & Puner, all of New York City, Isidore H. Schweidel, of Philadelphia, Pa., Cecil Page, Stewart M. Seymour, and Thomas Kiernan, all of New York City, for intervening objecting bondholders.

Edith A. Merritt, a bondholder, pro se.

Before MARIS, Circuit Judge, and WELSH and KALODNER, District Judges.

MARIS, Circuit Judge.

The Lehigh Valley Railroad Company and three of its subsidiary corporations, the Lehigh Valley Rail Way Company, Lehigh Valley Railroad Company of New Jersey, and Pennsylvania and New York Canal and Railroad Company, on August 7, 1939, filed in this court petitions averring that they are unable to meet their debts, matured or about to mature, and that they desire to carry out a plan of adjustment, dated August 25, 1938, under the provisions of Chapter XV of the Bankruptcy Act, 11 U.S.C.A. c. 15, § 1200 et seq. A special court of three judges was at once convened as directed by Sec. 713 of the Bankruptcy Act, 11 U.S.C.A. § 1213. Thereupon the court approved the petitions as properly filed under Chapter XV, directed that they be heard and disposed of in a single proceeding, fixed September 29, 1939, for a hearing, and directed that notice of the hearing be given to all persons in interest. One of the judges of the special court having died and another having found himself to be disqualified, the special court was reconstituted on September 27, 1939. The court as reconstituted held the hearing upon the plan of adjustment on September 29, 1939, which hearing was continued by adjournments on December 8, 1939, March 15, 1940, June 7, 1940, and June 27, 1940 and concluded on July 25, 1940.

The Lehigh Valley Railroad Company (hereinafter called the "Lehigh Valley" or the "Company") is a railroad corporation of the State of Pennsylvania. It operates by direct ownership, stock ownership and lease, a railroad system (hereinafter called the "railroad" or the "system") of some 1,300 road miles in the states of New York, New Jersey and Pennsylvania. Its principal operating office is and for many years has been in the City of Bethlehem in the Eastern District of Pennsylvania. The Lehigh Valley operates the entire railroad. It has a number of wholly owned subsidiaries, the properties of which it leases. Among these are Pennsylvania and New York Canal and Railroad Company, a Pennsylvania corporation (hereinafter called the "Canal Company"), which owns a substantial portion of the railroad in Pennsylvania, the Lehigh Valley Rail Way Company, a New York corporation, (hereinafter called the "Rail Way Company"), which owns most of the property of the railroad in the State of New York, and Lehigh Valley Railroad Company of New Jersey, a New Jersey corporation (hereinafter called the "New Jersey Company"), which owns most of the property of the railroad in New Jersey.

The Lehigh Valley's railroad is an old and seasoned one, well constructed and

well maintained. The Company enjoys a diversified traffic, a larger part of its freight revenues being derived from steel, foodstuffs, chemicals, machinery, cement and coal. In the years from 1921 to 1929 it enjoyed large operating revenues and showed a substantial net income after the payment of fixed charges in each year except 1922. In 1930 it began to feel the effects of the economic depression and its operating revenues dropped very greatly. They continued to fall in 1931 and 1932, the decline over the period of three years being almost 50%. In 1933 and 1934, however, the operating revenues leveled off and then began to recover. They increased in 1935 and again substantially in 1936, the increased revenues being maintained in the early part of 1937. Expenditures for maintenance were reduced as revenues declined but when the revenues began to increase again maintenance expenditures were kept down to the previous low level. The result was that although during the years from 1932 to 1935 the operations showed net deficits, the operations of 1936 and 1937 resulted in a net income.

About the middle of the year 1937 a sudden decline in operating revenues took place and continued during 1938 to a point where on April 1st of the latter year the Lehigh Valley had $1,246,000 in cash, $778,000 in bills outstanding, and was faced with the payment on May 1st of interest on its General Consolidated Mortgage Bonds (hereinafter called the "General Consolidated Bonds") amounting to approximately $1,558,000. On April 30th the Company borrowed from the Reconstruction Finance Corporation (hereinafter called the "R. F. C.") $778,000 which was applied to maintenance account. With the money thus freed and with other funds which it secured the Lehigh Valley was able to pay the interest due on the next day on the General Consolidated Bonds. At this time the system owed a total funded debt outstanding in the hands of the public of approximately $154,250,000. Of this debt three issues were about to mature. $8,500,000 Canal Company Consolidated Mortgage Bonds (hereinafter called the "Canal Bonds") became due April 1, 1939. $15,000,000 Rail Way Company First Mortgage Bonds (hereinafter called the "Rail Way Bonds") matured July 1, 1940. $9,999,000 Lehigh Valley Terminal Railway Company First Mortgage Bonds (hereinafter called the "Ter-

minal Bonds") assumed by the New Jersey Company were payable October 1, 1941. The Lehigh Valley had guaranteed the payment of all three issues of bonds. The Lehigh Valley also owed the R. F. C. registered serial collateral notes totalling approximately $1,333,000 in addition to the sum of $778,000 which it had borrowed on April 30th. The Company also owed Manufacturers Trust Company of New York $5,000,000 payable March 1, 1940, and Philadelphia National Bank $1,200,000 payable September 10, 1938. In June, 1938, it was obliged to borrow the further sum of $2,175,000 from Manufacturers Trust Company of New York, Marine Midland Trust Company of New York and Marine Trust Company of Buffalo. These obligations aggregating $8,375,000 are hereinafter called the "bank loans." The R. F. C. and bank loans were secured by the pledge of collateral consisting of system obligations or shares of stock which had been in the treasury of the Lehigh Valley.

In the light of the precipitate decline in the gross revenues of the Lehigh Valley the approaching maturity of three first mortgage bond issues aggregating $33,-499,000 secured upon various important portions of its line, the necessity of meeting its obligations to the R. F. C. and the banks, aggregating more than $10,000,000, and the necessity of making the interest payments on its General Consolidated Bonds, amounting annually to more than $3,000,000, made it obvious that some arrangement must be made by the Company for dealing with its debts. It accordingly entered into negotiations with its bondholders and other creditors and under date of August 25, 1938, it submitted to them the plan for the adjustment of its debts which in the present proceeding it asks this court to approve and confirm.

Very briefly stated, the principal features of the plan are (a) to extend the maturity of the three presently maturing first mortgage bond issues for a period of ten years, (b) to extend the R. F. C. and bank loans to November 1, 1943, and (c) to extend without interest for a period of five years 75% of the amount of each of the five semi-annual installments of interest falling due from November 1, 1938, to November 1, 1940, inclusive, upon the General Consolidated Bonds. Certain of the general provisions of the plan will also be noted. So long as the total debt of the system shall

exceed $120,000,000 75% of its net income is to be withheld from the payment of dividends. 40% of the amount thus set aside may be retained as a capital fund and the balance, not less than 45% of the total net income, is to be applied in a sinking fund to retire the R. F. C. and bank loans, to anticipate the deferred installments of interest on the General Consolidated Bonds, and to retire obligations senior in lien to those bonds. So long as the R. F. C. and bank loans and the deferred interest on the General Consolidated Bonds remain unpaid, no dividends whatever are to be paid to shareholders. Supplemental indentures are to be executed as to each of the bond issues affected by the plan. A committee of bondholders is provided for to take important responsibility in carrying out the plan.

By December 28, 1938, assents to the plan of adjustment had been received from the banks, from the R. F. C., subject to approval of its action by the Interstate Commerce Commission, and from more than 80% of each of the four classes of bondholders affected by the plan. Accordingly on that date the Lehigh Valley filed with the Interstate Commerce Commission a petition asking its approval of the plan and asking also that it approve the extension of the R. F. C. loans. The petition was joined in by its three affected subsidiaries. On March 1, 1939, Division 4 of the Commission filed its report finding that the adjustments proposed by the plan are for lawful objects and compatible with the public interest, are necessary and appropriate for and consistent with the proper performance of the petitioners' service to the public as common carriers and that the proposals will not impair the ability of the petitioners to perform that service. At the same time the Commission filed its order authorizing the carrying out of the plan. Lehigh Valley Railroad Company and Subsidiaries Financial Readjustment, 230 I.C.C. 685. On the same day the full Commission filed its report finding that the Lehigh Valley is not in need of financial reorganization in the public interest if the plan of August 5, 1938 becomes operative and that the extension of the R. F. C. loan should be authorized provided the extension becomes operative at the same time that the plan becomes operative. An appropriate supplemental certificate was on the same day issued. Lehigh Valley Railroad Company Reconstruction Loan, 230 I.C.C. 670.

On March 14, 1939, the Lehigh Valley declared the plan operative. On July 28, 1939 Chapter XV was added to the Bankruptcy Act by the Act of July 28, 1939, c. 393, 53 Stat. 1134, and ten days later the Lehigh Valley and its subsidiaries filed the petitions now before us seeking approval and confirmation of the plan.

We have carefully considered the plan and the objections thereto in the light of the evidence offered at the hearings and of the arguments of counsel. Our conclusion is that the plan and the adjustment which it provides should be approved and confirmed without modification. We shall immediately enter a final decree which will include findings in full detail of all the facts referred to in clauses (1) to (6), inclusive, of Section 725 of the Bankruptcy Act, 11 U.S.C.A. § 1225(1–6). Many of these findings relate to formal and uncontested matters as to which on the record before us there can be no debate and which therefore require no discussion here. We shall accordingly confine ourselves to a discussion of those facts as to which there may be controversy, the objections which have been made and the questions of law which have been raised.

■■ The benefits of Chapter XV are by its terms not available to a railroad corporation which is in need of financial reorganization of the character provided for under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. To put the matter differently, it must appear that the railroad corporation's inability to meet its debts matured or about to mature is reasonably expected to be temporary only. We think that in the light of these tests the benefits of Chapter XV are available to the Lehigh Valley and its subsidiaries. The evidence strongly supports the conclusion that the Company's difficulties are temporary. The revenues of the system have been steadily increasing since 1938. A fair estimate of the net income to be expected for the present year indicates that it will be the largest enjoyed since 1930. There are reasonable grounds for believing that the upward trend will continue to the extent necessary to enable the Lehigh Valley to meet its obligations as modified by the proposed plan of adjustment.

■ Is the plan of adjustment, considering the probable prospective earnings of the Lehigh Valley in the light of its past earnings and of such changes as may reasonably be expected, in the public interest

and in the best interests of its creditors and stockholders? Is it feasible, financially advisable and not likely to be followed by the insolvency of the Lehigh Valley or by the need of financial reorganization or adjustment? Here we are dealing with the future and we must base our judgment upon the experience of the past in the light of present trends. Obviously any plan which avoids reorganization and bankruptcy and which thereby keeps the railroad operating normally is in the public interest. We think it is likewise in the interest of all creditors to keep the system which is the only asset available for the payment of their claims in a solvent going condition. It is equally in the interest of the stockholders since reorganization or bankruptcy might well result in the entire loss of their equity. We, therefore, conclude that the plan is in the public interest and in the best interests of the creditors and stockholders if it is feasible, financially advisable and not likely to be followed by insolvency or need of financial reorganization.

■ Is the plan feasible? We think it is. Its feasibility is of course dependent upon the results of the railroad's operations in the years to come. The results of these operations can, as we have said, only be estimated at this time. Our conclusion of feasibility is, therefore, necessarily based upon two assumptions. One of these is that the gross operating income will continue to be not less than the amount realized during the present year. The evidence indicates that this assumption may fairly be made. We must also assume that the railroad will continue to keep its expenditures for maintenance, additions and betterments at approximately the present figures. The testimony of the president of the Lehigh Valley indicates that this assumption also is reasonable. A third factor must be considered at this point, however. Since 1932 the Lehigh Valley and many other railroads operating in the State of New Jersey have been contesting the taxes levied upon their property by the State. Pending the determination of this controversy the Lehigh Valley has paid only about 60% of the taxes actually levied. If payment of the total amount of these taxes should ultimately be enforced it is quite doubtful whether the plan of adjustment now proposed would be feasible. However, negotiations for the adjustment of these taxes upon a reasonable basis of compromise have been taking place. At

the last hearing the vice president and general counsel of the Lehigh Valley testified that he was confident that a settlement would be reached with the State of New Jersey under which all of the taxes levied for the years 1932 and 1933 will be paid and approximately 75% of the taxes levied for subsequent years. The evidence indicates that such a settlement, if it is reached, can be carried out under the plan. We think it fair to assume that a tax settlement will be arrived at which will not endanger the plan. Our conclusion as to this is fortified by a letter from the Attorney General of the State of New Jersey to counsel for the Lehigh Valley, which was offered in evidence, in which the Attorney General, on behalf of the State of New Jersey, urged the approval of the plan. We conclude that the plan is feasible. Its financial advisability is apparent from the record. The evidence which supports our conclusion of feasibility furnishes equal support for the conclusion that adoption of the plan is not likely to be followed by insolvency of the Lehigh Valley or by need of financial reorganization or adjustment.

We accordingly turn to the consideration of the question whether the plan is fair and equitable as an adjustment and affords due recognition to the rights of each class of creditors and stockholders and fair consideration to each class thereof adversely affected. Before considering this question, however, we must classify the creditors adversely affected. Their proper classification is disputed. The Lehigh Valley urges that there are but six classes, as follows: (1) The holders of the Canal Bonds; (2) the holders of the Rail Way Bonds; (3) the holders of the Terminal Bonds; (4) the holders of the General Consolidated Bonds (5) the R. F. C. and (6) the banks. The Harvard State Bank of Harvard, Illinois, a nonassenting holder of $5,000 Terminal Bonds asserts on the contrary that it and its fellow nonassenting holders of bonds of that issue are entitled to be classified separately from the holders of Terminal Bonds who have assented to the plan. Its argument is that the latter by their assent to a plan which has been declared operative have voluntarily modified their rights to an extent requiring separate classification from those whose original rights remain intact. We see no merit in this contention.

■ We think it is clear that the classes of creditors referred to in Section

725, 11 U.S.C.A. § 1225, are the same as those referred to in Section 710, 11 U.S.C.A. § 1210; and that both sections refer to the classes of creditors as they existed before any assents were obtained to the plan of adjustment under consideration. The interpretation of the act contended for the Harvard State Bank would make it necessary to obtain the assent of three-fifths of a class of creditors all of whom had already refused to give their consent. As Judge Chesnut said of a similar contention in a similar proceeding, In re Baltimore & O. R. Co., D.C., 29 F.Supp. 608, 623, it is "obviously untenable because it would preclude all possibility of the confirmation of any plan under the Act if there was a single dissenting creditor holding a single $1,000 bond." See also In re Wichita Falls & Southern Ry. Co., D.C., 30 F.Supp. 750. We cannot believe that Congress intended such an absurd result which would entirely defeat the purpose of Chapter XV and render the relief which it offers to the railroads illusory indeed.

Furthermore the premise upon which the objecting bondholder's argument is based is without support in the record. It is a holder of Terminal Bonds. Article III of the plan provides that the Lehigh Valley will not, without the consent of the committee of bondholders for which it provides, make any payments in respect of any Terminal Bond which will not have become subject to the plan nor permit the New Jersey Company to make any such payment, unless a like payment on the Terminal Bonds subject to the plan shall simultaneously be made. It further provides that the supplemental indenture to be executed by the New Jersey Company with respect to the Terminal Bonds shall provide that a default in the performance of this agreement shall constitute an event of default within the meaning of the mortgage securing the Terminal Bonds. These provisions make it clear that assentors and nonassentors must under the provisions of the plan receive the same treatment with respect to their holdings of Terminal Bonds, and that nonassentors may not receive preferential treatment. Consequently there is not in fact any substantial difference between the rights of the two groups which requires them to be separately classified.

■ A different question with regard to classification is raised by James Rosenwald and other holders of Canal Bonds. That issue of bonds matured April 1, 1939, a little more than four months before this proceeding began. On July 10, 1939, these bondholders, having previously brought suit, obtained judgment in the Supreme Court of the State of New York against the Lehigh Valley for the amount of principal and interest due on their Canal Bonds. Appeals from these judgments were taken by the Lehigh Valley and are now pending in the state Court of Appeals. The holders of these judgments now contend in this proceeding that they should not be classified as holders of Canal Bonds but rather placed in a separate class as judgment creditors of the Lehigh Valley not affected by the plan. In view of the fact that appeals from these judgments are still pending and may ultimately result in their reversal we will not now decide this question but will leave it open for future determination by an appropriate tribunal if and when it becomes necessary to decide it.

■ In considering the fairness of the plan with respect to each class of securityholders we must examine the present position of the respective classes. First there are the holders of the Canal, Rail Way and Terminal Bonds. Each of these issues is a first lien upon an important portion of the railroad. Then also there are the holders of the General Consolidated Bonds. The mortgage securing these bonds is a second lien upon some of the railroad property and a third lien upon other portions of it. The annual interest upon the bonds of this issue is over $3,000,000, almost half of the Lehigh Valley's normal annual fixed charges. If the railroad should be forced to reorganize, the holders of these bonds obviously would be the greatest sufferers among the secured creditors. A third class of creditors affected by the plan are the banks and the R. F. C. Their claims are secured by the pledge of securities, having a face amount many millions of dollars in excess of the amount of the claims. Finally there are shareholders of the Lehigh Valley who have a substantial equity which might be seriously affected if reorganization took place.

In this situation it is clear that the holders of the three issues of first mortgage bonds and the banks and the R. F. C. are the claimants whose position in the system entitles them to primary consideration. In recognition of this fact the plan provides merely for the extension of the maturity

of the principal of these bonds. Their security is to continue unimpaired and they are to receive interest at the present rates during the extended period. Far below these two groups so far as security is concerned stand the holders of the General Consolidated Bonds. The primary necessity of the Lehigh Valley in its financial difficulty is to secure cash with which presently to liquidate the loans from the banks and the R. F. C. and thus to release the collateral which they hold and which comprises substantially all of the assets of the Company available for future financing. The only feasible way which has been suggested to provide immediate funds for this purpose is to require the holders of the General Consolidated Bonds to accept the postponement for a limited period of a portion of the interest upon their bonds, and thereby to release a substantial portion of the operating revenues of the Company. The plan accordingly provides for the postponement for five years of 75% of each of five semi-annual installments of interest upon these bonds. This is undoubtedly a hardship, particularly upon individual holders. However, in consideration of this postponement these bondholders receive a very real benefit, namely, a reasonable assurance that the railroad, which constitutes their security and from the operating revenues of which their interest payments must come, will continue to operate as a going concern for their benefit. Unless some plan is adopted they are faced, almost certainly, with the cessation of all interest payments. Furthermore, as we have seen, a sinking fund is to be provided which may benefit them materially by accelerating the payment of their deferred interest installments in case the future revenues of the Company should prove greater than now anticipated.

While the shareholders stand to benefit in the long run by the avoidance of reorganization or bankruptcy and the continuance of the railroad as a going concern they give up all right to receive dividends so long as the R. F. C. and bank loans and deferred General Consolidated Bond interest remain unpaid. Furthermore they do not under the plan receive any benefits at the expense of the creditors. On the contrary by giving up all possibility of dividends from 75% of the net income until the system's indebtedness is reduced to $120,000,000 they contribute substantially to the protection of the bondholders. Con-

sequently the contention of Victor S. Geltner and Lena Mendelsohn, trustees under the will of Louis Silverstein, holders of $3,000 Terminal Bonds, that the plan of adjustment is unfair and inequitable under the rule laid down in Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S. Ct. 1, 84 L.Ed. 110, cannot be sustained. We conclude that the plan is fair and equitable as an adjustment and that it affords due recognition and fair consideration to each class of securityholders adversely affected by it.

There remains for consideration the petition of Greydon A. Rhodes, a holder of $27,000 General Consolidated Bonds, that the Lehigh Valley be restrained from paying out any portion of the net amount which may be received by it upon its claim against Germany for damages resulting from the Black Tom explosion and for a modification of the plan so as to provide that the Black Tom award when received be applied to the discharge of the deferred interest installments upon the General Consolidated Bonds. A brief statement of the facts with regard to the Black Tom claim is necessary in order to understand the question raised.

On July 31, 1916, the Black Tom Terminal in New York Harbor owned by the Lehigh Valley was blown up. As a result of the explosion the Company suffered a loss of about $10,000,000, including large sums paid to various persons to satisfy damage claims. From time to time these payments for damages were charged off until there now stands upon the books of the Lehigh Valley an item of approximately $1,796,000 unadjusted debit arising from this source. This item was included in the balance sheet attached to the plan of adjustment. The Company's claim for damages was prosecuted before the Mixed Claims Commission set up by agreement between the United States and Germany upon the theory that the explosion was caused by German saboteurs. On October 30, 1939, the Mixed Claims Commission announced its award in favor of the Lehigh Valley in the amount of $9,900,322.27 with interest. Payment of this amount has not been made, however, because of litigation pending in the District Court for the District of Columbia and not yet finally disposed of on appeal.

The net amount to be received by the Lehigh Valley from this claim cannot presently be determined for a number of rea-

sons. In the first place it seems certain that the funds available for its payment will not be sufficient to pay it in full. Then also the fees and expenses of counsel incurred in prosecuting the claim and collecting the award must be paid out of the gross amount received. The Lehigh Valley has entered into an agreement with its counsel in this case, Amos J. Peaslee, for the payment to him of 50% of the amount received to cover all the fees and expenses of himself and his associates. This amount is subject to revision, however, in a proceeding instituted by the Lehigh Valley before the American Commissioner of the Mixed Claims Commission under the provisions of the Settlement of War Claims Act of 1928, 50 U.S.C.A.Appendix, § 9 et seq., for the determination of the reasonable fees payable to counsel in this matter. In an opinion filed May 22, 1940, this court held that the proceeding thus pending before the American Commissioner was the appropriate proceeding for the determination of the amount of the fees to be paid out of the fund. 34 F.Supp. 750. Until that proceeding is concluded it is obvious that the amount cannot definitely be known. Finally the amount received upon the Black Tom Award may constitute income and consequently be subject to income tax in amounts now unknown. In view of all these uncertain factors we cannot now say that more than $3,500,000 of this award when received by the Lehigh Valley will become available for its general purposes.

The Company has assigned any sums received by it upon the Black Tom award to the R. F. C. as additional collateral security for its loans. These loans aggregated $1,722,500 on January 1, 1940. Consequently when, and if the net proceeds of the Black Tom award are actually received by the Lehigh Valley and the loans from the Reconstruction Finance Corporation are thereby paid, it does not certainly appear at this time that more than $1,800,000 of the sum received will remain available for the general purposes of the Lehigh Valley. We have pointed out, however, that there now stands upon the Company's books an item of approximately that amount which represents unadjusted debits arising from the Black Tom explosion. Consequently it may well be that the balance of the fund will be consumed by its application to these debits.

Enough has been said to demonstrate how inappropriate it would be for this court at this time to direct the specific application by the Lehigh Valley of a fund so uncertain in amount and in time of receipt. We conclude that this court ought not by modification of the plan or otherwise to direct the specific application of this fund when and if it is received. The Lehigh Valley must be left free to deal with it in such way as it may think proper within the limits prescribed by its legal and contractual obligations. The petition of Greydon A. Rhodes will accordingly be denied.

For the reasons herein stated and in the light of the facts disclosed by the evidence received in this proceeding a decree will forthwith be entered fully setting forth our findings of fact and approving and confirming the Lehigh Valley Railroad Company's plan of debt adjustment.