102 F.3d 311
 65 USLW 2404, 37 Collier Bankr.Cas.2d 243,
Bankr. L. Rep. P 77,181
 In the Matter of Zandal HOSKINS and Debra A. Hoskins,
Debtors-Appellees.
Appeal of NBD Bank, N.A.
 No. 96-1885.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 25, 1996.
Decided Dec. 12, 1996.
 
 Cecile A. Blau, Douglas B. Bates, Allen L. Morris, W.R. Beard (argued), Christine S. Talley, Stites & Harbison, Jeffersonville, IN, for Appellant.
 Joseph M. Black, Rothring, Lambring & Black (argued), Seymour, IN, pro se.
 Lloyd Koehler, Pettay & Associates, New Albany, IN, Gary Edward Klein (argued), National Consumer Law Center, Boston, MA, for Debtor-Appellee.
 Norma L. Hammes, Gold & Hammes, San Jose, CA, for amicus curiae National Association of Consumer Bankruptcy Attorneys, Inc.
 Before POSNER, Chief Judge, and EASTERBROOK and ROVNER, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 This appeal raises the difficult issue of the standard for valuing secured claims in a Chapter 13 bankruptcy. When secured claims are filed in a liquidation (Chapter 7), the most common form of bankruptcy, the debtor's assets are sold and from the proceeds of the sale the secured creditors recover the market value of their collateral, plus, if they are undersecured--that is, owed more than those proceeds--the equivalent of deficiency judgments in the form of unsecured claims for the difference between what they are owed and what their collateral fetched at the sale. We say when secured claims are made in a liquidation because unless the secured creditor is oversecured (which would mean that the debtor retained equity in the collateral) he has, in principle, the alternative of bypassing the bankruptcy and foreclosing on his lien, In re Tarnow, 749 F.2d 464, 465 (7th Cir.1984), although it will ordinarily be to his advantage to file a claim, Lynn M. LoPucki, Strategies for Creditors in Bankruptcy Proceedings §§ 7.5, 7.8, and p. 400 (2d ed. 1991), and he may even find himself dragged into the bankruptcy proceeding against his will. In re Lindsey, 823 F.2d 189, 191 (7th Cir.1987).
 
 
 2
 The price obtained in a liquidation is usually a wholesale rather than a retail price. Retail value is simply wholesale value plus the costs of selling at retail, In re Ebbler Furniture & Appliances, Inc., 804 F.2d 87, 92 (7th Cir.1986) (concurring opinion), and those costs are avoided when the collateral is sold by a repossessing creditor who is not himself a retail dealer, or by his surrogate, the sheriff or a trustee in bankruptcy, see Douglas G. Baird & Thomas H. Jackson, Cases, Problems, and Materials on Bankruptcy 10 (2d ed. 1990)--neither of whom is a retail dealer--rather than by a secured creditor who does happen to be a retailer. Liquidation value, in other words, normally is wholesale value. Once in a while a secured claim must be valued in a Chapter 7 proceeding, rather than enforced through the sale of the collateral. This might be necessary because the assets have been sold in a bloc and the proceeds have to be allocated among the secured creditors, or to determine whether the debtor has any equity in the collateral or how much he must offer in order to redeem the collateral. 11 U.S.C. §§ 362(d)(2)(A), 722. But we can disregard these exceptions to the use of the market to place a value on the debtor's assets in a liquidation.
 
 
 3
 In a corporate reorganization under Chapter 11 of the Bankruptcy Code, the debtor retains its assets. Any secured creditor who is neither paid in full on the spot nor permitted to foreclose on his lien exchanges his original security interest for a new interest--common or preferred stock, or debentures or some other type of bond. Chapter 13 is a counterpart to Chapter 11, but for individuals who have a regular income, rather than for business firms. In re Schaitz, 913 F.2d 452, 453 (7th Cir.1990). Chapter 13 authorizes the bankruptcy court to confirm a plan under which the debtor will be permitted to retain possession of the collateral of his secured creditors, and the creditors (both secured and unsecured) will in effect refinance their loans, much as in a Chapter 11 reorganization. The secured creditor is entitled to receive a security interest, or other property, at least as valuable as his original secured claim, 11 U.S.C. § 1325(a)(5)(B), so it becomes essential to value that original claim. That value is defined by section 506(a) as "the value of [the] creditor's interest in the estate's interest in [the] property" of the debtor's estate in which the creditor has his lien, as "determined in light of the purpose of the valuation and of the proposed disposition or use of [the] property."
 
 
 4
 NBD Bank, the appellant, has a lien on the Hoskinses' 1990 Ford Tempo. The trustee in bankruptcy, in his proposed Chapter 13 plan, valued the bank's secured claim at $3,987.50, which is midway between the stipulated retail value of the car, $4,650.00, and the stipulated wholesale value, $3,325.00. The bankruptcy court confirmed the plan, including the valuation of the car proposed by the trustee. 183 B.R. 166 (Bankr.S.D.Ind.1995). The district judge affirmed. The bank appeals, contending that the retail value is the proper value.
 
 
 5
 The briefs and arguments of the parties are full of false starts. Both sides appeal to the "plain meaning" of section 506(a)--a bad sign. Both claim the authority of case law for their position, while acknowledging as they must that the circuits are divided on the proper standard for valuing the interests of secured creditors in Chapter 13 proceedings. Compare In re Rash, 90 F.3d 1036, 1060-61 (5th Cir.1996) (en banc) (wholesale value), with In re Taffi, 96 F.3d 1190 (9th Cir.1996) (en banc) (Chapter 11); In re Trimble, 50 F.3d 530 (8th Cir.1995); In re Winthrop Old Farm Nurseries, Inc., 50 F.3d 72, 74-76 (1st Cir.1995) (Chapter 11); In re McClurkin, 31 F.3d 401, 404-05 (6th Cir.1994); In re Coker, 973 F.2d 258, 260 (4th Cir.1992) (all retail value); see generally 2 Keith M. Lundin, Chapter 13 Bankruptcy § 5.48 (2d ed. 1994). When there is a circuit split, there is no "authority" to guide the undecided circuits. Authority is a ground for decision over and above reasons, and so drops out when the courts to whose authority another court might defer cannot agree on the proper resolution of the issue. We are not bound by the decision of another circuit. But if the only other circuit or circuits to have decided the issue had decided it one way, this would be a reason over and above the reasoning employed in those decisions for following them.
 
 
 6
 At argument the bank's counsel asserted ill-advisedly that nothing turns on the fact that this is a Chapter 13 case. Much may, since, as we have seen, the usual value of a secured claim in a Chapter 7 bankruptcy is its liquidation value, which normally is its wholesale value, and the bank is claiming retail value. But we hesitate to bind parties by concessions made in the heat of oral argument, and shall not do so here. For his part the trustee, though he had proposed a valuation midway between retail and wholesale value and the bankruptcy and district judges had accepted it, has not defended this midpoint as being a proper standard for valuation. He argues that valuation is to be done on an ad hoc basis, case by case, and that since the bankruptcy judge not unreasonably found that splitting the difference would be the "equitable" solution in this case, we are bound by it. But it is one thing to say that a uniform standard of valuation must be applied case by case, since application depends on the facts and they are different from case to case. It is another thing to say that there is no standard. Although there is some support in the legislative history for such an approach, H.R.Rep. No. 595, 95th Cong., 2d Sess., at 356 (1978); S.Rep. No. 989, 95th Cong., 2d Sess., at 68 (1978) U.S.Code Cong. & Admin.News 1978, at 5787, it would be peculiarly inappropriate to the valuation of Chapter 13 property. These are tiny cases. The debtor usually has few assets. To prevent the costs of bankruptcy litigation from eating up the entire debtor's estate, a simple rule of valuation is needed. Wholesale price is one simple rule; retail price another; the midpoint of the two prices is a third. None is enacted or excluded by the statute. We must decide which is best.
 
 
 7
 We get little help from the statute. The "value of creditor's interest" clause does not seem to bear on the question at all. "Value" is not defined; and, so far as appears, the word "creditor's" is just meant to remind us that a lien is not coextensive with the property that it is a lien on. The legislative history points both toward and away from equating "creditor's interest" to wholesale value. Compare H.R.Rep. No. 595, supra, at 124, with id. at 356. The clause that we earlier denoted by --"such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of [the] property"--is somewhat tautological, somewhat opaque, but also somewhat helpful. Of course value should be determined in light of the purpose of the valuation, but the purpose is merely to give the secured creditor the value of his security interest, so we are back to square one. But not entirely. Because that value will differ among the different stages and kinds of bankruptcy, the reference to "purpose" could imply usefully that the section 506(a) standard of valuation is not unitary. Specifically, it may mean something different in a Chapter 13 case from what it means in a Chapter 7 case, contrary to the bank's concession.
 
 
 8
 The reference to "the proposed disposition or use of [the] property" might seem to imply that a debtor who is intending to use the property to generate income should be given a break. The higher the value placed by the bankruptcy court on retained collateral, the heavier the payments that the debtor will be required to make under the plan to keep the collateral and so the likelier he will be to fail to keep up the payments and thus lose the collateral after all. This loss will work to the disadvantage of the debtor and his unsecured creditors--the latter both directly, by reducing the fraction of the debtor's future income that is available for the satisfaction of their claims, and indirectly if as a result of the debtor's loss of an income-producing asset, such as an automobile used in his job or to get to and from it, the debtor's income falls before he has completed his stretched-out payments to the unsecured creditors.
 
 
 9
 Yet we hesitate to read section 506(a) as designed to give either the debtor or the unsecured creditors a substantive advantage they would not have if they were trying to enforce their rights outside of bankruptcy. A policy of preferring unsecured to secured creditors, or debtors to either, is contrary to the lodestar that guides the administration of bankruptcy: bankruptcy preserves rather than alters creditors' preexisting entitlements, and merely consolidates their claims in order to prevent a race to dismember the debtor that may make the creditors as a whole worse off. Butner v. United States, 440 U.S. 48, 55-56, 99 S.Ct. 914, 918-19, 59 L.Ed.2d 136 (1979); Baird & Jackson, supra, at 42. The unsecured creditors get a break, moreover, whenever the debtor is permitted to retain an asset that can be used to help generate income to pay their claims, rather than being forced to give up the asset to the secured creditors forthwith, as would be the effect of liquidation. Unsecured creditors usually get nothing in the Chapter 7 bankruptcy of an individual. 2 David G. Epstein, Steve H. Nickles & James J. White, Bankruptcy § 7.1, p. 280 (1992); 2 id., § 7.9, p. 300. Chapter 13 is by its very design, and without need to alter creditors' preexisting entitlements, a boon to the unsecured creditor.
 
 
 10
 The Ninth Circuit in Taffi thought that the word "use" in the second clause points to retail value in a case in which the debtor is going to continue to use the property. Wholesale value--the value that would be realized if the debtor were not going to continue using the property, if instead the property were sold--cannot be right for a case in which the property is not sold. 96 F.3d at 1192. This would be a good argument if retail value were the only alternative to wholesale value, but, as the present case illustrates, it is not. The midpoint between the two values is another alternative and one the Ninth Circuit did not consider. The significance of the statute's reference to different possible uses of retained collateral is that it invites judicial attention to an economic problem that may well be acute in cases in which the collateral is essential to the debtor's livelihood. The economic problem is that of bilateral monopoly, a concept that is no longer a stranger to the law, see, e.g., Walgreen Co. v. Sara Creek Property Co., 966 F.2d 273, 276 (7th Cir.1992); Milbrew, Inc. v. Commissioner, 710 F.2d 1302, 1306-07 (7th Cir.1983), and that can help with the interpretation of this vague bankruptcy statute. The term "bilateral monopoly" refers to a situation in which two persons can bargain over some thing of value only with each other; neither can rely on competition to determine the price of the thing. An example familiar to lawyers is the settlement of a simple two-party suit for damages. The plaintiff can settle only with the defendant, and the defendant only with the plaintiff. Suppose that the plaintiff calculates the net value to himself of going to trial rather than settling as $20,000, and the defendant calculates the net cost to himself of trial rather than settlement as $40,000. At any settlement between $20,000 and $40,000 both parties will consider themselves better off than they would be by going to trial.
 
 
 11
 Were it not for Chapter 13, the relation between secured creditor and defaulting debtor would be as good an example of bilateral monopoly as the settlement of a lawsuit is. If the Hoskinses had defaulted on the loan from NBD secured by their Ford and there had been no bankruptcy proceeding, the bank could have seized and sold the car. It would obtain only the wholesale value, because banks are not in the retail automobile business. It might obtain a deficiency judgment as well and seek to garnish the Hoskinses' wages or to levy on their other assets in order to collect; but that is a right that it retains, in effect, in bankruptcy as well, in the form of a right to make an unsecured claim for the difference between the value of the collateral and the amount of the loan. The issue for us is what that value would be outside bankruptcy, and it would be what the bank would get for the car if it seized it.
 
 
 12
 By seizing the car, the bank would not be recovering its loan in full but it would be depriving the Hoskinses of automotive transportation. Supposing they needed the car--and most Americans who live outside of New York City regard a car as a necessity rather than a luxury, whether or not they need it in order to be able to hold a job--they would find themselves having to buy a new one, for which presumably they would have to pay the retail price. That is one reason the bank's concern that if the debtor's car is valued at less than retail value the debtor will turn around and sell it at retail and gain a windfall is a chimera. Another reason is that an individual, as distinct from a retail dealer, is unlikely to be able to sell a car for its full retail value, if only because he could not give a meaningful warranty.
 
 
 13
 This analysis shows that while the bank would not agree to forgive or stretch out the loan for less than a package of rights worth as much as the wholesale price of the car, the Hoskinses would not agree to refinance the loan on the basis of a value of the car greater than its retail value. At any price between these two valuations, both parties would be better off than if the bank repossessed the car--the Hoskinses (and presumably the general creditors as well, for the reasons explained earlier) because they would be retaining their automobile at a price less than the price to them of a comparable automobile; the bank because it would be getting a new secured interest worth more than the wholesale price, the price the bank would get if it seized and sold the car.
 
 
 14
 There is no way to predict where in the bargaining range the bargain would be struck. But to economize on bargaining costs, people who find themselves in a bilateral monopoly situation will often agree simply to split the difference. The midpoint is what game theorists call a "focal point," a natural point to which bargaining parties will gravitate if they don't want to waste a lot of time in bluffing and haggling. See, e.g., Douglas G. Baird, Robert H. Gertner & Randal C. Picker, Game Theory and the Law 39 (1994). So the midpoint of the bargaining range, which is the point that the bankruptcy court chose in this case, is a reasonable approximation of the likely average valuation of the debtor's automobile that the secured creditor and defaulting debtor would agree upon (were there no Chapter 13) in the type of situation for which Chapter 13 was designed--the insolvency of an individual debtor with a regular income. Since it is desirable to have a rule for determining value in these low-value cases rather than a flabby standard, and since the midpoint rule is superior from the standpoint of the underlying economics of the situation to either of the alternative rules--wholesale value or retail value--we hold that in Chapter 13 cases involving automobiles and similar assets used to produce income for the debtor the value of the secured interest is the average of the retail and the wholesale value of the collateral.
 
 
 15
 We said earlier that bankruptcy preserves rather than alters creditors' preexisting entitlements; so if the bank's entitlement, were it to proceed to enforce its lien against the Hoskinses' car outside bankruptcy, were to the wholesale value of the car, or to the retail value of the car, or to the midpoint of those values, we would not have had to discuss the economics of the bank's position. But the bank's entitlement, were it to proceed under state law, would be merely to dispose of the car in a commercially reasonable manner. UCC § 9-504. Whatever the commercially reasonable mode of disposition fetched would be the value of the lien, up to the amount due the bank on its loan. One commercially reasonable disposition would be to let the debtors retain the use of their car in exchange for a new schedule of payments that would compensate the bank for surrendering (or deferring) its right to foreclose. In that event the value realized on the lien by the (perfectly lawful) threat to foreclose might well exceed the car's auction value. It just is not possible to attach a determinate value to the bank's lien outside bankruptcy.
 
 
 16
 We do not think that the midpoint solution is inconsistent with the Supreme Court's decision in Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 129-31, 60 S.Ct. 1, 13-15, 84 L.Ed. 110 (1939), which holds that a plan for reorganization under Chapter 11 is unfair to creditors if it gives the shareholders a large stake in the reorganized firm merely because the shareholders have the practical power to frustrate the reorganization. The Court explained that by filing for protection under Chapter 11, the shareholders had given up their control of the firm and any strategic power conferred by that control. Id. at 130, 60 S.Ct. at 14. Shareholders are not creditors; they are the debtor's owners, and to allow them to wring concessions from the creditors would be contrary to the policy of the bankruptcy laws. Nothing of that kind is involved here. Closer perhaps is the concept of voidable preference, 11 U.S.C. § 547, which prevents a creditor who may have a strategic hold over the debtor from using this hold to gain an advantage over the other creditors. But there it is the Bankruptcy Code itself that, for reasons fundamental to bankruptcy's purpose of preventing a mutually destructive feeding frenzy by creditors, forbids a creditor to duplicate in bankruptcy a strategic advantage that he might enjoy outside it.
 
 
 17
 The dispute between creditors in this case cannot be resolved by reference to any policy of bankruptcy law other than trying to give creditors in bankruptcy what they would get outside it, at least if that can be accomplished by means of a simple rule. If secured creditors' liens are valued at only their wholesale value in a Chapter 13 case, the unsecured creditors will receive a windfall compared to what they would have received outside bankruptcy, because if the car had been seized and sold by the secured creditor the Hoskinses might have lost their regular income out of which the unsecured creditors hope to recover a portion at least of their loans. If secured creditors are entitled to value their secured interests at retail value, the bank obtains the windfall, at the expense of the unsecured creditors, because the bank would not have gotten retail value had it seized and sold the car. The rule we adopt is necessary to avoid windfalls, and in fact to neutralize the strategic power that either set of creditors would enjoy under the alternative rules. Retail value would reward the bank for its being able outside of bankruptcy to threaten to take away the Hoskinses' car and with it perhaps their livelihood, and wholesale value would reward the unsecured creditors for the Hoskinses' being able outside of bankruptcy to threaten to abandon the car to the bank, which, if that happened, could probably obtain no more than wholesale value for it.
 
 
 18
 We need not attempt to decide the proper rule for valuing other types of asset in Chapter 13 cases. A serious bilateral monopoly problem could also arise in the case of an asset that had sentimental value for the debtor, or in the case of a residence with or without sentimental value if the owner would face substantial relocation costs if forced to move. In either case there would be a substantial bargaining range. We leave the issue of valuation presented by these assets to be resolved another day, as we do the implications (if any) of our analysis for Chapter 11 cases. Chapter 11 entitles the secured creditor to what he would receive "if the debtor were liquidated under chapter 7." 11 U.S.C. § 1129(a)(7)(A)(ii). But that is not the only floor. He is entitled to "the value of [his] interest in the estate's interest in the property," which is section 506(a) terminology. 11 U.S.C. § 1129(b)(2)(A)(i)(II); 3 Collier on Bankruptcy para. 506.01 (15th ed., Lawrence P. King ed. 1996). As we noted earlier, the second clause, the purpose and disposition clause, of section 506(a) implies that a uniform method for valuing different kinds of asset or in different kinds of bankruptcy proceeding is not required.
 
 
 19
 AFFIRMED.
 
 
 20
 EASTERBROOK, Circuit Judge, concurring in the judgment.
 
 
 21
 Courts of appeals have adopted two approaches to valuing a security interest in bankruptcy when the collateral is not going to be sold. Compare In re Rash, 90 F.3d 1036 (5th Cir.1996) (en banc), petition for certiorari pending under the name Associates Commercial Corp. v. Rash, No. 96-454 (filed Sept. 20, 1996) (wholesale value), with In re Taffi, 96 F.3d 1190 (9th Cir.1996) (en banc) (retail value). My colleagues endorse a third: the midpoint of the wholesale-retail range. I concur in the judgment, but only because the Trustee, representing the interests of the unsecured creditors, has not taken a cross-appeal.
 
 
 22
 Two elements of the majority's analysis are convincing. First, we need a legal rule of decision. The Trustee's anything-goes approach misunderstands what it means to say that judges decide case-by-case. They do not apply different rules of law to identical facts; instead they apply uniform rules of law to disparate sets of facts. Second, the Bankruptcy Code does not supply a rule of decision. It tells the court that a secured creditor prevented from recovering the property must receive, in exchange, payments equal to the value of the claim. 11 U.S.C. § 1325(a)(5)(B). How much is that? A secured creditor is entitled to "the value of such creditor's interest in the estate's interest in such property", 11 U.S.C. § 506(a), which means "the value of the collateral," United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 372, 108 S.Ct. 626, 630-31, 98 L.Ed.2d 740 (1988), a rephrasing that still does not tell the court how to determine "value."To obtain the missing standard we must turn, as so often in bankruptcy law, to the states' definitions of property rights. Butner v. United States, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); BFP v. Resolution Trust Corp., 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). Value may differ across categories of reorganizations and kinds of assets because the relevant non-bankruptcy entitlements and methods of quantifying value differ. This is the point of the second sentence of § 506(a). See Rash, 90 F.3d at 1045-51. Under the Uniform Commercial Code, which governs security interests in personal property such as automobiles (though not land or leaseholds), a security interest gives the creditor the right to seize and sell the collateral. See UCC §§ 9-502 to 9-505. When the non-bankruptcy entitlement is the power to sell at auction (or in another commercially reasonable way), then the secured portion of a claim is the net price the chattel would fetch at such a sale--in a word, wholesale. (An inter-dealer wholesale market in used cars involves some negotiated sales and some auctions; in this market, at least, the wholesale price and the normal outcome of a foreclosure auction are identical.) This standard of valuation does not depend on which chapter of the Bankruptcy Code applies, the identity or business of the creditor, or the likely outcome of private bargaining designed to avoid foreclosure. Neither state law nor § 506(a) refers to such matters.
 
 
 23
 A property interest is what a state court would respect if the dispute went to judgment. Threat positions often influence what people pay out of court, but we have it on high authority that these do not affect valuation in bankruptcy. Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 129-32, 60 S.Ct. 1, 13-15, 84 L.Ed. 110 (1939). Los Angeles Lumber holds that a credible threat to litigate and other negotiating strategies do not affect the value of a debt in bankruptcy, even if as a practical matter they alter the parties' wealth outside of bankruptcy. This means that when estimating the value of a claim the judge should use an actual or hypothetical sale as the measure; the consumer surplus or going-concern value goes to the party entitled to it by contract or positive law, rather than to the party with the most bargaining power. My colleagues' contrary conclusion, which establishes a standard of valuation different from the amount a state court would award to the secured creditor outside of bankruptcy, cannot be reconciled with Butner or Los Angeles Lumber. It is not sound to distinguish Los Angeles Lumber on the ground that the potential threat there was made by equity holders rather than debt holders. Equity and debt in a corporation create different sets of rights--though both of them are "ownership" interests--but these differences do not affect the question whether the likely outcome of a private bargain in the shadow of the law affects the standard of "value" that a court should use in a bankruptcy case.
 
 
 24
 Put security interests aside for a moment and consider the value of two commercial debts. Debtor owes Creditor A $500, and the expenses of obtaining a judgment and seizing assets to execute it are $1,000. Outside of bankruptcy this debt has little value; in a hypothetical bargaining game Debtor will refuse to pay, and Creditor A may bluff but in the end will not spend $1,000 to collect $500. If Debtor files a bankruptcy petition, however, Creditor A will submit a claim for $500, which will be recognized in full and be satisfied in the same proportion as other unsecured debts--even though these other debts may be worth more on the dollar outside bankruptcy. Creditor A's non-bankruptcy entitlement is $500, which is the measure of the claim in bankruptcy. Now change the facts a little. Debtor owes Creditor B $500, and again the expenses of obtaining and collecting a judgment would be $1,000. But Creditor B is a long-term vendor to Debtor, and instead of threatening litigation Creditor B will threaten to cut off supplies essential to Debtor's business. Debtor will pay up, even when other debts go unpaid. Bankruptcy law recognizes that this occurs but does not honor Creditor B's leverage; instead the payment is apt to be called a preference and reversed under 11 U.S.C. § 547. See In re Tolona Pizza Products Corp., 3 F.3d 1029 (7th Cir.1993). Once again, the $500 debt will go into the pool with other unsecured debts, and each creditor will receive an equal percentage of the claim. Yet Creditor B is much like the lender with a security interest in a car the debtor needs for work; the creditor has the debtor over a barrel and will use this in bargaining. (Indeed, there is little economic difference between security interests and mutual dependencies. See Oliver E. Williamson, Credible Commitments: Using Hostages to Support Exchange, 73 Am. Econ. Rev. 519 (1983); Lester Telser, A Theory of Self-Enforcing Agreements, 53 J. Bus. 27 (1980).) On the majority's approach, Creditor B ought to receive $500 because this is the outcome of non-bankruptcy bargaining, while Creditor A gets nothing. Instead of aping the likely out-of-court payoff, however, the bankruptcy judge will treat the claims the same way a state court would: as of equal value.
 
 
 25
 Now consider a simple security interest in a case under Chapter 7. Debtor operates a restaurant, and the only secured creditor has a security interest in the restaurant's oven. The debt to this creditor is $5,000; another $20,000 owed to remaining creditors is unsecured. The oven could be ripped out and sold at auction for $3,000; the retail price (including delivery and installation) of a used oven of identical quality is $5,000. Debtor's assets will be sold and the pot of cash used to pay creditors. The building is worth more as a restaurant than as a dry goods store, so it will be sold intact; the trustee will not destroy the going-concern value. The building, contents, and goodwill fetch $15,000. Who gets how much? The norm under state law, and therefore under § 506(a), is that the secured creditor receives $3,000 for the security interest--the net price the oven would fetch in a hypothetical sale, without any element of the going-concern value being attributed to the oven--and is treated as an unsecured creditor for the remaining $2,000. See Dewsnup v. Timm, 502 U.S. 410, 414-15, 112 S.Ct. 773, 776-77, 116 L.Ed.2d 903 (1992); United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 239, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989); In re McClurkin, 31 F.3d 401 (6th Cir.1994). Thus $12,000 is available to distribute to creditors owed a total of $22,000. Each creditor receives about 55 percent of its claim. All told, the secured creditor gets $4,091 ($3,000 for the secured portion of the claim, plus 55 percent of the $2,000 unsecured portion) and the other creditors receive $10,909.
 
 
 26
 A thoroughgoing application of the majority's approach, however, would treat the security interest in the oven as worth $4,000--for that creditor, just like the bank with a security interest in a car, can bargain outside of bankruptcy in light of the holdup value the security interest confers. The premises and business are worth $15,000 with the oven in place and $10,000 without (the difference representing the cost of replacing the oven if the creditor hauls it away). The creditor won't accept less than $3,000; the restaurateur won't pay more than $5,000; the focal point of bargaining is $4,000. If the court treats the creditor as having a secured claim of $4,000, then $11,000 remains to apportion among holders of $21,000 in unsecured claims. Each receives a dividend of approximately 52 percent. The secured creditor obtains a total of $4,524 ($4,000 for the secured portion of the claim, plus 52.4 percent of the $1,000 unsecured portion) and the unsecured creditors receive $10,476.
 
 
 27
 Under Chapter 7 this hypothetical secured creditor receives $4,091 rather than $4,524. So much my colleagues concede. Does anything change if, in a reorganization under Chapter 11, the debtor never sells the restaurant, but continues to operate it? According to the Bankruptcy Code, the answer is no. In this reorganization the old stockholders will be wiped out, and the old creditors will become the new equity owners. Each former creditor receives securities according to the value of its claim--and the value of the secured creditor's claim is limited by the ability of unsecured creditors to engineer a cramdown, under which the secured creditor gets what it would receive in Chapter 7. 11 U.S.C. § 1129(a)(7)(A)(ii). So the fact that there is no sale does not affect the creditors' relative entitlements.
 
 
 28
 Now move to Chapter 13. Does anything change? The debtor in the Chapter 13 case keeps the asset, just as the debtor in a Chapter 11 reorganization does. Here the asset's value (if it contributes to the debtor's earnings) is converted to cash and distributed to the creditors. A Chapter 13 debtor pays a stated percentage of income for a specified time. 11 U.S.C. §§ 1322(a)(1), (c), 1325(b)(1)(B). The present value of that payment stream is economically equivalent to the price at a sale of the debtor's assets, and the real contestants in our case--just as in the restaurant hypothetical--are the secured and unsecured creditors. Each wants a larger fraction of the payment stream. Congress could create a special rule for bankruptcies under Chapter 13. It did so for home loans. 11 U.S.C. § 1322(b)(2); Nobelman v. American Savings Bank, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). It did not do so for automobile credit. Instead it reiterated the normal rule for valuing a secured creditor's rights in a cramdown. 11 U.S.C. § 1325(a)(5)(B). We know what that is for a chattel covered by Article 9 of the UCC: the net price in a sale, which is to say wholesale value. The rest of the debt is unsecured and goes into the pot with other unsecured claims.
 
 
 29
 Opinions favoring retail value exude a belief that wholesale yields an unjustified wealth transfer to debtors who weasel out of their bargains, neither paying the agreed price nor surrendering the car, and then "charging" their creditors for the costs of a sale that does not occur. Under Chapter 13, however, the valuation of the secured claim has nothing to do with the question whether the debtor has paid too little for the assets retained. The judge requires the debtor to pay a portion of his income to the trustee, who apportions the receipts among creditors according to their entitlements. If the judge sets monthly payments or the number of months too low, or undervalues claims in the aggregate, there will be a wealth transfer in debtors' favor, but the amount of the transfer is unrelated to the valuation of the secured portion of any given claim, which affects only the relative stakes of secured and unsecured debts. Valuation rules therefore should be identical across chapters.
 
 
 30
 Here's another way to see the point that a security interest is worth the asset's wholesale value even if the debtor keeps the collateral. Suppose the Bank foreclosed on the car outside of bankruptcy. Who would buy, and for how much? The parties stipulated that the wholesale value of the car was $3,325. My colleagues suppose, with good reason, that the car was worth more than that to the Hoskinses. So at auction (or any other commercially reasonable disposition) they would offer $3,326, which would prevail. No auto dealer would pay more; by hypothesis, dealers can get equivalent cars for $3,325. The Bank would not bid more, because a higher bid would reduce its deficiency judgment (the unsecured portion of the claim) without producing anything in return. Thus the car would remain in the Hoskinses' garage, and the secured portion of the Bank's claim would be liquidated at the car's wholesale value. All of this illustrates the point that, in competition, the highest-valuing user gets the property at a price representing its second-best deployment. See Van Zelst v. CIR, 100 F.3d 1259 (7th Cir.1996); R. Preston McAfee & John McMillan, Auctions and Bidding, 25 J. Econ. Lit. 699 (1987). The second-highest price plus a little extra carries the day; the highest-valuing user enjoys the rest of the value as consumer surplus. After the auction, the Hoskinses would remain liable for the deficiency judgment, and the Bank would stand in line with their other creditors. That is what a bankruptcy valuation is supposed to replicate, and the use of wholesale price does the job.