**In re BAXTER & BAXTER, INC., Debtor.**

**Bankruptcy No. 91–B–15101(PBA).**

United States Bankruptcy Court, S.D. New York.

Sept. 22, 1994.

Tenzer, Greenblatt, Fallon & Kaplan by James Glass, Glen Rubin, New York City, for debtor.

Reisman, Peirez, Reisman & Calica by Jerome Reisman, Garden City, NY, for Dime Sav. Bank of Williamsburgh.

## MEMORANDUM DECISION DENYING MOTION FOR CONFIRMATION AND GRANTING MOTION TO LIFT AUTOMATIC STAY

PRUDENCE BEATTY ABRAM,
Bankruptcy Judge.

The debtor has sought confirmation of a plan of reorganization in this single-asset real estate Chapter 11 case under the "cram-down" provisions of Bankruptcy Code § 1129(b). For the reasons more fully discussed below, the plan cannot be confirmed and the secured creditor's motion to lift the automatic stay should be granted.

*FINDINGS OF FACT*

1. Baxter & Baxter, Inc. (the "Debtor") filed its Chapter 11 petition on November 12, 1991. The Debtor's sole shareholder is Milton Rinzler ("Rinzler").[1]

2. The Debtor's only business is owning and operating a five-story walk-up apartment building with fifteen apartments located at 339 East 65th Street, New York, New York (the "Property"). Rinzler directs the management of the Debtor and the Property.

3. The Property is encumbered by a non-recourse mortgage held by the Dime Savings Bank of Williamsburgh ("Dime"). The principal amount due on Dime's mortgage is approximately $993,822. The mortgage note provided for the payment of interest only at the rate of 10.5% with the principal to be paid at maturity on May 1, 1995. Under certain circumstances, the mortgage could be extended for an additional 5 years. The August 1991 mortgage payment was not made and Dime commenced a foreclosure proceeding just prior to the date the Chapter 11 petition was filed.[2]

4. Shortly after the Chapter 11 petition was filed, Dime made a motion seeking to dismiss the petition on the grounds that it was filed in bad faith, to lift the automatic stay to permit Dime to proceed with its foreclosure action and to pursue its state remedies, and to prohibit the Debtor from using cash collateral in which Dime had an interest and to direct the Debtor to segregate the cash collateral. The Debtor opposed the motion.

5. Thereafter, the court approved a stipulation providing for the use by the Debtor of the cash collateral consisting of the rental income from the Property on the terms specified in the stipulation. The court denied the

---

1. An involuntary Chapter 11 petition was filed against Rinzler on January 14, 1992. An order for relief was entered on February 6, 1992 and Rinzler continued as a debtor in possession.

Earlier and on September 17, 1991, an involuntary petition was filed against Dominion Financial Corp. ("Dominion"), a corporation owned by Rinzler. An order for relief was entered in that case on November 11, 1991.

Rinzler and Dominion filed a joint plan which was confirmed on April 7, 1994. The creditors

of Rinzler and Dominion have effectively abandoned any interest in the Property to Rinzler individually.

2. While not of any relevance to the legal issues now before the court, it is worth noting that Rinzler acquired ownership of the Property by way of a deed in lieu of foreclosure of a second mortgage held by Dominion. Rinzler transferred title to the Property to the Debtor just a few weeks before it filed its Chapter 11 petition.

portion of Dime's motion seeking to have the petition dismissed as a bad faith filing. The Debtor opposed the motion to lift the automatic stay and asserted that it should be given the opportunity to propose a plan of reorganization. The court declined to lift the stay pending consideration of a plan.

6. The Debtor filed an initial disclosure statement and plan of reorganization on December 18, 1992. Thereafter, the Debtor filed an amended plan (the "Plan") and an amended disclosure statement (the "Disclosure Statement") on February 18, 1993.

7. By order dated November 30, 1992, the court directed Dime to file a notice as to whether it would elect treatment under Code § 1111(b) prior to the hearing on the Disclosure Statement. Dime determined not to make a § 1111(b) election with respect to the Plan. Thus, Dime has a secured claim to the extent of the value of the Property and an unsecured claim for the balance of the amount due to it.

8. By order dated February 23, 1993, the court approved the Disclosure Statement. The court concluded that Dime's objections to the Disclosure Statement raised issues of substance which should be reserved and considered at the confirmation hearing.

9. The Plan provides for four classes of claims and one class of interests. Class I is Dime's secured claim. Class II is Dime's unsecured deficiency claim. Class III consists of all other general unsecured claims. Class IV is comprised of tenant security deposit claims. Class V is comprised of the interests in the stock of the Debtor.

10. The Plan treats Dime's Class I secured claim as follows: The claim is allowed in the amount of $650,000. A principal payment of $100,000 is to be made to Dime at confirmation. In addition, Dime would receive a substitute mortgage and mortgage note in the amount of $550,000 maturing in seven years on or about April 30, 2000. Interest on the mortgage is to be at a rate of 7.5% for the first three years; 8% in the fourth and fifth years; 9% in the sixth year; and 10% in year seven.

11. As to Dime's Class II unsecured claim, the Plan provides for a payment of $35,000, or 10% of the approximately $350,000 unsecured claim. Class III, the unsecured creditors, are to receive $.10 for each $1.00 of their allowed claims. The tenants who are in Class IV will receive a return of their security deposits, if, as and when the security deposits become payable to them.

12. As to Class V, the Plan provides for Rinzler to transfer all his interest in the Debtor to his wife, Roberta Rinzler ("Roberta"). In return, Roberta would provide new value to the Debtor in the amount equal to the payment of all administrative and priority claims and contribute an additional $135,000 to the Debtor for the purposes of confirmation of the Plan. A total of approximately $210,000 would be required.

13. The certification of acceptances and rejections of the Plan reflects that Classes I and II, the two classes for Dime's claims, rejected the Plan. Class III voted to accept the plan. Class IV did not vote since it was not impaired. Class V voted to accept the Plan.

14. Class III consists of five unsecured claims totaling $116,000. Of that amount, $108,000 is a claim by Rinzler for loans made to the Debtor. Rinzler waived his right to any distribution under the Plan.

15. At the confirmation hearing both the Debtor and Dime offered testimony with respect the appropriateness of the terms of the proposed substitute note and mortgage. The Debtor's expert opined that the interest rates proposed were commercially reasonable and that since the substitute mortgage was approximately 80% of the value of the Property there was a reasonable loan-to-value ratio for a commercial loan. Dime offered testimony disputing the reasonableness of the proposed interest rates and loan-to-value ratio. Dime also objected to the lengthy extension from the original mortgage's maturity date made by the proposed substitute mortgage as imposing an enhanced risk.

### DISCUSSION

■ Confirmation of a Chapter 11 plan requires that the court find compliance with the requirements of Code § 1129(a). In this

case the Debtor is unable to satisfy the requirement of Code § 1129(a)(10) that at least one impaired class of claims accept the plan without including any acceptance of the plan by an insider.[3]

Facially, the requirement appears to have been met because Class III has accepted the Plan without inclusion of the insider claim of Rinzler. However, the Plan is based on a classification scheme similar to that this court had approved in *In re D & W Realty Corp.*, 156 B.R. 140 (Bankr.S.D.N.Y.1993).[4] *D & W* was reversed on appeal. *See In re D & W Realty Corp.*, 165 B.R. 127 (S.D.N.Y. 1994). Moreover, thereafter the Second Circuit in *In re Boston Post Road Ltd. Partnership*, 21 F.3d 477 (2d Cir.1994) expressly rejected the *D & W* analysis with respect to the permissibility of separate classification of the undersecured creditor's deficiency claim. When Classes II and III are combined as they must be if separate classification is not permissible, the class has not accepted the Plan by the requisite majorities in number

and amount because of Dime's vote to reject the Plan.

The Debtor cannot cram-down the Plan because Code § 1129(b) allows a plan proponent to cram-down a plan only if all requirements of Code § 1129(a), with the exception of § 1129(a)(8)[5], are met. Without at least one impaired class that has accepted the Plan, the requirements of Code § 1129(a)(10) have not been met.

The *Boston Post Road* decision clearly looks upon the confirmation of a single-asset real estate case over the lender's objection as aberrational. Whether the decision rejects the so-called new value exception to the absolute priority rule to permit confirmation of a Chapter 11 plan under all circumstances is unclear.

■ The new value exception has been the subject of much discussion in recent years in law review articles and cases. Even if this court were to hold that the new value exception did survive adoption of the Bankruptcy Code, the exception would not be available to the Debtor.[6] The new value contribution on

3. The term insider is defined in Code § 101(31). When the debtor is a corporation, the term includes officers and directors of the debtor as well as a person in control of the debtor.

4. Whether the actual classification in this case is identical to that in *D & W* is open to question. In this case, the court fixed the time in which Dime was required to make the § 1111(b) election for a date prior to the disclosure statement hearing over Dime's objection. As a result at the time the disclosure statement was approved, Dime's unsecured claim was just that, an unsecured claim. In contrast, in *D & W* the disclosure statement was approved before the undersecured creditor was required to make the election. *See D & W*, 156 B.R. at 144–5.

5. Code § 1129(a)(8) requires that each class of claims or interests either accept the plan or be not impaired.

6. This court is obviously bound by the Second Circuit's decision in *Boston Post Road* despite its disagreement with it. In this court's view, the issue of proper classification and the availability of the new value exception are separate questions. *See D & W*, 156 B.R. at 145.

Adopting a unitary classification rule means that one never reaches the issue of the new value exception because it is a confirmation issue. Secured creditors may be right that many, if not all, single asset real estate cases should not have a

plan confirmed over their opposition. This, however, should not allow a secured creditor to prevent the court from considering the issue in the context of confirmation when it can be ruled on the merits, rather than through a preliminary procedural ruling on classification.

This court's view is that if the new value exception survived and is to be applied in single asset real estate cases, then some consideration needs to be given to how it should be applied in the very different factual context of such cases. *See Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 117, 60 S.Ct. 1, 7, 84 L.Ed. 110 (1939) (" 'Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them.' ") In this court's view, the funds necessary to the success of the undertaking are those that are required to pay the mortgage down to a commercially reasonable loan-to-value ratio in addition to whatever amounts are required to be paid for the expenses of administration and to unsecured creditors. In this court's view the contribution of a nominal dollar amount, *i.e.*, $50,000 or $100,-000, sufficient only to pay unsecured creditors and the debtor's attorneys, with all payments to the secured creditor to come only from the property's income should not satisfy the new value exception. Such an offer of nominal new value is particularly egregious when the secured creditor ends up with a mortgage predicted on a

which the Plan is predicated is not being made by a creditor or equity security holder of the Debtor. Roberta's only relation to this case at this time is that she is the wife of the present shareholder.

 This court concludes the express provisions of the Code dealing with the sale of a debtor's property must be read *in pari materia* with Code § 1129(b). In this court's view, the provision of new value by a stranger to the case in exchange for all of the stock of the Debtor is functionally a sale. The Bankruptcy Code uses the term sale in Code § 363 and elsewhere. However, nowhere does the Code define the term.

Uniform Commercial Code § 2–106(1) states "a 'sale' consists in the passing of title from the seller to the buyer for a price".[7] This court finds that this is an apt description of what happens when a stranger to a case succeeds to the ownership of a debtor under a plan providing for the contribution of new value.

It is true that the proposed contributor of the new value in this case is the wife of the existing shareholder. Despite the close connection between the existing shareholder and the proposed new shareholder, they are not one and the same. The wife is not a debtor in any case under the Bankruptcy Code. She owns property in her own right. No doubt Rinzler, as the existing shareholder, hopes to benefit from his wife's ownership of the Debtor. However, that hope of indirect benefit is simply different than a contribution of new value made by an existing equity security holder or creditor.

■ Since the Debtor has no equity in the Property and no plan can be proposed that can be confirmed over Dime's opposition, it follows that the automatic stay should be lifted. *See* Code § 362(d)(2).

100% loan-to-value ratio and with no guarantee against a decline in the value of the property. A nominal offer may be essential to the confirmation of the plan but it cannot be said to be essential to "the success of the undertaking". The undertaking necessarily includes the ongoing operation of the real property. Without an adequate equity cushion post-confirmation for the secured creditor as well as adequate working capital, there can be no assurance that the debtor

*CONCLUSION*

Based on the foregoing reasons, this court denies confirmation of the Debtor's Plan and grants Dime's motion to lift the automatic stay. Settle appropriate order.

will be able to make timely mortgage payments, keep the property properly maintained or pay off the mortgage at maturity.

7. There are, of course, limits to the application of the UCC's provisions relative to sales. In particular, Article 2 of the UCC applies only to goods. However, as will be seen, this court's thesis does not turn on an exacting application of particular UCC provisions.