NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0447n.06

No. 23-1936

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |
|---|---|
| In re: SETTLEMENT FACILITY DOW CORNING TRUST. | ) ) ) ) |
| _____ | ) |
| KOREAN CLAIMANTS, | ) ) |
| Interested Parties-Appellants, | ) ) |
| v. | ) ) |
| DOW SILICONES CORPORATION, et al., | ) ) |
| Interested Parties-Appellees. | ) ) |

FILED
Nov 07, 2024
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: SUTTON, Chief Judge; READLER and BLOOMEKATZ, Circuit Judges.

READLER, Circuit Judge. For nearly three decades, Dow Corning Corporation's 1995 bankruptcy has spawned a seemingly unending series of legal disputes involving numerous parties. Take the Korean Claimants, for instance, who return to this Court for the fifth time. On this go-round, they seek replacement checks from Dow Silicones Corporation ("Dow," the successor to Dow Corning Corporation) because their originally distributed settlement checks have expired. But a district court order prevents them from doing so. That order, the Korean Claimants say, violated numerous protections ensured to claimants by the Bankruptcy Code, the reorganization plan, and even the United States Constitution.

We disagree. In the end, the Korean Claimants had a 180-day window to cash their duly disbursed checks, and beyond that an additional four years to seek reissued payments or otherwise

request relief from the district court. As no source of law requires anything more, we affirm the district court's order.

I.

For over two decades, Dow served as the predominant American manufacturer of silicone gel breast implants. That market collapsed, however, when the Food and Drug Administration ordered sharp restrictions on the use of silicone gel implants, given their potential link to various auto-immune diseases. *See* Philip J. Hilts, *F.D.A. Restricts Use of Implants Pending Studies*, N.Y. Times, Apr. 17, 1992, at A1. Hundreds of thousands of potentially affected implant recipients sued Dow shortly thereafter, driving the company to file for reorganization under Chapter 11 of the Bankruptcy Code in 1995. *See* Barnaby J. Feder, *Dow Corning in Bankruptcy over Lawsuits*, N.Y. Times, May 16, 1995, at A1.

Four years later, the bankruptcy court confirmed the Amended Joint Plan of Reorganization ("Reorganization Plan"). For those claimants interested in settling their claims, the Plan directed them to the Settlement Facility. Wielding funds with a then–net present value of $1.95 billion, the Settlement Facility resolved claims pursuant to the Settlement Facility and Fund Distribution Agreement ("Settlement Facility Agreement") and the Reorganization Plan. Under district court supervision and with the aid of interested parties' representatives, a Claims Administrator oversaw "the processing and payment of Claims by the Settlement Facility." To address settlement matters, the district court created a new case, one distinct from the prior bankruptcy court case.

Cue the Korean Claimants. Comprised of certain Korean residents, the group opted for settlement, and in turn qualified as "first-priority" claimants. *See In re Settlement Facility Dow Corning Tr.*, No. 21-2665, 2023 WL 2155056, at *1 (6th Cir. Feb. 22, 2023). This designation meant they were "virtually guaranteed" to receive payment from the Settlement Facility. *In re*

*Settlement Facility Dow Corning Tr.*, 754 F. App'x 409, 417 (6th Cir. 2018). And indeed, more than a thousand eligible Claimants received checks. Only one problem: 200 of them never cashed their payments within the 180-day expiration window. Like last week's bread, their checks had grown stale.

Like many things in life, the payment process could not last forever. The Settlement Facility Agreement therefore established June 3, 2019, as the final deadline for filing claims. To enforce this deadline, the district court issued a series of closing orders. Two are worth emphasizing.

The first is Closing Order 2, which issued in March 2019. Closing Order 2 limited disbursements of replacement checks after June 3, 2019, to two circumstances: where a claimant was deceased; or where the claimant or their attorney demonstrated "good cause," as determined by the Claims Administrator. Closing Order 2 also indicated that the district court would specify the last date upon which the Settlement Facility could issue payments absent express court direction, labeled the "final distribution deadline."

That deadline was set in the other relevant order, the Joint Stipulation and Agreed Order for Procedures for Addressing Requests to Reissue Payments and to Establish the Final Distribution Date for Such Claims, or "the Order." Issued by the district court in October 2023, the Order implemented the terms of Closing Order 2. The Order established December 1, 2023, as the final distribution deadline. It also prohibited the replacement of checks that expired before June 3, 2019, regardless of "good cause" for such reissuance; prohibited replacement checks for claimants with stale-dated checks who had requested a replacement, whether granted or denied; and gave a one-month period for all claimants outside these two groups to seek replacement checks.

The Korean Claimants sought repayment to no avail. The Claims Administrator denied repayment because their checks expired before June 3, 2019. Rather than seek relief in district court, the claimants appealed the Order. That is the appeal before us today.

## II.

Although Dow and the Korean Claimants agree that this Court has jurisdiction on this appeal, we must assure ourselves that is in fact the case. *Drake v. Gordon*, 848 F.2d 701, 704 (6th Cir. 1988) (explaining that "parties, even by express agreement, cannot confer jurisdiction on this court to entertain an appeal from something less than a final, appealable order"). As courts of limited jurisdiction, *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), federal appellate courts may ordinarily preside over only "final decisions of the district courts of the United States," 28 U.S.C. § 1291. A decision is "final" for purposes of § 1291 if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945) (citing *St. Louis, Iron Mountain & S. Ry. Co. v. S. Express Co.*, 108 U.S. 24, 28 (1883)).

We agree with the parties that jurisdiction exists. Consider the state of play when the district court entered the Order. The Settlement Facility had finished accepting new claims and was preparing to issue final checks for those approved. The Order furthered that effort by resolving outstanding payments owed to claimants with expired, uncashed, or still-pending checks—prohibiting some from seeking repayment entirely and allowing the rest to do so only until November 1, 2023. By that date, in other words, the Settlement Facility knew the status of every

payment, and no further action could take place regarding the Korean Claimants' checks. That suffices for finality under § 1291.

True, the district court case remains open. But its post-Order actions involve modest administrative matters, such as approving the Settlement Facility's fees and expenses and monitoring the return or destruction of sensitive data. As none of these tasks remotely concern the Korean Claimants' payments, they do not upset finality under § 1291. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200 (1988) (concluding attorney's fee request did not disturb finality under § 1291 because it "is not part of the merits of the action to which the fees pertain").

## III.

A. Moving to the merits, the Korean Claimants first argue that the Order violates principles of due process set forth in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). *Mullane* familiarly instructs that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314 (citations omitted). According to the Korean Claimants, the Order failed to honor these guarantees.

We disagree. On multiple occasions, the Korean Claimants received sufficient notice of the final distribution deadline. In March 2019, the district court wrote (in bold text, no less) that "[t]he final distribution deadline will be set forth in an order and will be posted on the SF-DCT website so that claimants and attorneys receive appropriate notice." In March 2023, Dow and other interested parties requested a final distribution deadline consistent with Closing Order 2. And in October 2023, the district court entered that deadline, setting it for December 1, 2023.

True, the district court entered the Order without holding a hearing that involved the Korean Claimants. But it is difficult to see why that fact is dispositive, considering the surrounding

circumstances. Every deadline in Closing Order 2 and the Order was readily available to the Korean Claimants. *See* Fed. R. Civ. P. 5(b)(2)(E) (deeming paper served from "sending it to a registered user by filing it with the court's electronic-filing system"). They knew for over four years that the district court planned to set a final deadline for replacement checks. And they knew for over six months that Dow and other interested parties moved the court to set that deadline. Claimants enjoyed the right to challenge that motion by, say, submitting an objection or recommending a different deadline. In short, all necessary parties—including the Korean Claimants—received adequate notice and wielded the opportunity to be heard, if they so desired. Yet the Korean Claimants waited to act until the Order issued. That fact is surprising, as Claimants were responsive to many other aspects of this decades-long litigation, reflecting their familiarity with the court's electronic docket. And rather than asking to be heard in district court in response to the Order, Claimants instead appealed it, asserting that their four-and-a-half years of notice somehow fell below the constitutional floor. Due process does not demand more of the district court.

B.    Falling short on constitutional grounds, the Korean Claimants next invoke the Bankruptcy Code. Citing 11 U.S.C. § 1129(b)(1), they allege that the Order improperly discriminated against them or, alternatively, failed to satisfy the statute's fair-and-equitable standard by closing claims of those with uncashed checks.

At the outset, it bears mentioning that § 1129(b)(1) is a poor fit for this type of challenge. Intended to permit so-called "cramdown" plans that lack the consent of each creditor class, *see RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 641–42 (2012), the statute codifies the "absolute priority rule" by providing that every senior creditor's claim must be fully satisfied before members of junior classes receive anything, *see Case v. L.A. Lumber Prods. Co.*,

308 U.S. 106, 116–17 (1939). Phrases like "discriminate unfairly" and "fair and equitable" in § 1129(b)(1) thus reference the judicial obligation to properly adhere to the priorities of creditors in bankruptcy, *see* 1 *Collier on Bankruptcy* ¶ 1.07[3][d][vi] (16th ed. 2024), not the perceived unfairness of an allegedly insufficient period to cash checks.

Even if § 1129(b)(1) more widely forbids discrimination and inequity, the Korean Claimants still fall short. Far from serving a discriminatory purpose, the Order broadly applies to all claims with expired checks issued before the final deadline. Nor were the Korean Claimants treated unjustly. Rather, they enjoyed 180 days to cash their checks before they became stale-dated—the customary action period for those instruments, *see, e.g.*, U.C.C. § 4-404 (Am. L. Inst. & Unif. L. Comm'n 2023)—as well as four-and-a-half years to request replacement checks according to the terms of Closing Order 2. Back of the envelope math suggests that the Korean Claimants had at least 1,764 days each to seek payment. Closing their claims past that date does not strike us as unfair.

C. The Korean Claimants wage a final battle against the discharge of their claims, one based on asserted promises by Dow. By way of background, a bankruptcy court's confirmation of a reorganization plan ordinarily discharges the borrower from any debt (including "liability on a claim," 11 U.S.C. § 101(12)) that arises before the date of confirmation. *See* 11 U.S.C. § 1141(d)(1)(A). Here, Dow's discharge seemingly would encompass the claims made by the Korean Claimants. Claimants seek an exception to that customary practice because Dow allegedly falsely stated in 1999 that the claimants "would be taken care [of] in priority and would receive compensation in full."

As a starting point, Dow's purported twenty-five-year-old promise seems to have been honored by the Settlement Facility, which made payments available to the Korean Claimants.

After all, the Korean Claimants received valid checks. They simply failed to cash them in a timely manner. The Korean Claimants' citation to *Grogan v. Garner*, 498 U.S. 279 (1991), does not change our thinking. At bottom, the issue there involved a statutory exception to bankruptcy discharge that applies only to "individual debtor[s]," 11 U.S.C. § 523(a), which Dow is not, *see id.* § 101(9)(A)(i) (excluding "an individual" from the definition of "corporation").

Nor do we agree with the Korean Claimants that the district court abused its discretion in issuing the Order, which they allege is inconsistent with the Reorganization Plan. Here, the Korean Claimants emphasize the fact that the Reorganization Plan did not provide that claims underlying checks issued before June 3, 2019, would be permanently closed. Perhaps so. But the Reorganization Plan was never intended to be, nor could it feasibly have been, an all-seeing oracle with perfect foresight. The Reorganization Plan laid the general foundation for Dow's bankruptcy. In tandem with the Settlement Facility Agreement, the Plan empowered the district court with supervisory authority to oversee the morass of administrative issues that naturally arises from processing tens of thousands of claims. Numerous provisions in both documents expressly confer such power. *E.g.*, R. 1701-2, PageID#32896–97 ("[T]he [Bankruptcy] Court and, as applicable, the District Court, will retain exclusive jurisdiction . . . to enter orders in aid of this Plan and the Plan Documents . . . ."); R. 1707-3, PageID#33172 ("The resolution of Claims under the terms of this Settlement Facility Agreement . . . shall be supervised by the District Court."); *see also id.*, PageID#33172–73 ("With respect to claims administration functions, the Claims Administrator shall be supervised by the District Court."); *id.*, PageID#33183 ("The Claims Administrator shall have discretion to implement such additional procedures and routines as necessary to implement the Claims Resolution Procedures . . . ."); *id.* ("The Claims Administrator shall institute procedures . . . and shall develop claims-tracking and payment systems as necessary . . . ."); *id.*, PageID#33186

("The Claims Administrator shall have the plenary authority and obligation to institute procedures . . . to assure that payment is distributed only for Claims that satisfy the Claims Resolution Procedures."). That is more than good enough to justify the limitations in the Order. We do not expect a district court to specify every administrative minutia of a sprawling bankruptcy, let alone do so for events a quarter century down the road.

\*    \*    \*    \*    \*

We affirm the district court's order.